**In re TRAK AUTO CORPORATION,
Debtor.**

**No. 01–72167–DHA.**

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

March 4, 2002.

---

James T. Lloyd, Jr., Norfolk, VA, for Debtor.

Debera F. Conlon, Norfolk, VA, U.S. Trustee.

## MEMORANDUM OPINION AND ORDER

DAVID H. ADAMS, Bankruptcy Judge.

This matter comes before the Court on motions from several landlords of debtor seeking payment of post-petition rental obligations as administrative expenses. Debtor, the Official Unsecured Creditors' Committee and several of the landlords have presented briefs and argument on the method this Court should adopt to calculate post-petition rental and tax obligations. Also at issue is the assumption or rejection of one of debtor's store leases in the Chicago Market. This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### FINDINGS OF FACT

Trak Auto Corporation ("debtor") filed a voluntary petition under Chapter 11 of Title 11 of the United States Code on July 5, 2001. Debtor remains in possession and control of its auto parts supply business and assets pursuant to 11 U.S.C. § 1107.

Debtor has retail locations in eastern Virginia, the District of Columbia, Maryland, Illinois, Wisconsin, and Pennsylvania. Distribution centers for debtor are located in Illinois and Maryland, and debtor has offices in Michigan and Maryland. When this petition was filed, debtor operated approximately 196 retail locations in the referenced states. Since the filing, debtor has decided to liquidate its "Chicago Market" stores and to focus its reorganization efforts on the "Metro Market" which encompasses the metropolitan District of Columbia area, Maryland and Virginia.

Several landlords have filed memoranda regarding the payment of pre and post-petition charges incorporated as "other rents" in the various leases at issue. These landlords include store locations in both the "Metro Market" and stores in the "Chicago Market."

National Shopping and Novogroder are two of debtor's landlords. They hold commercial leases with debtor for the following store numbers as designated by debtor: stores 301, 303, 308, 333, 377, 703, 730, 302, 326, 327, 339, and 355. Only debtor's liability for certain unpaid common area maintenance (CAM) charges and real estate taxes are at issue with these two landlords. National Shopping and Novogroder have argued that we should adopt the accrual method in calculating debtor's administrative expense liability for these unpaid CAM charges and real estate taxes.

Another petitioning landlord is L.C.L. Company (hereinafter "L.C.L."), owner of the Ridge Shopping Center located in Richmond, Virginia where debtor leases its store number 697. L.C.L. seeks a determination that its lease with debtor be deemed rejected, citing numerous lease defaults. This landlord also pleads in the alternative, that if its lease is not deemed rejected, that debtor be required to abide

by prior orders of this Court directing debtor to comply with its lease terms and cure the existing defaults. Part of the curing of debtor's default for this particular center would include the repair of damages done to the landlord's shopping center and the repair and cleaning of the store as it has not been properly maintained, according to the landlord.

For Debtor's store number 230, the landlord, Blaurock Family Partnership (hereinafter "Blaurock"), seeks payment of real estate taxes and damages to the store as an administrative expense. The lease for this site was rejected by debtor as of January 4, 2002. Under Article 7 of the lease, debtor must "for the term of this Lease, reimburse Lessor the amount of any real property tax assessed on the demised premises for each fiscal year, or portion thereof." Blaurock's Exhibit A, Article 7. This store is located in Cook County, Illinois, which means that real property taxes are billed in arrears. Blaurock seeks payment of taxes billed to debtor on October 1, 2001 and payment of all taxes that have accrued since the filing of debtor's bankruptcy petition on July 5, 2001. The landlord also seeks payment resulting from damages to the dryvit canopy on the storefront caused by debtor drilling approximately 20 holes in order to hang a banner regarding the reletting of that store. Blaurock points to its lease which provides that debtor's alterations to the store shall not "adversely affect the structural strength of said building or the value of Lessor's property." Blaurock's Exhibit A, Article 8.5. Also instructive is the lease provision whereby "Lessee shall not make any exterior alterations or improvements without Lessor's written consent" and debtor nor landlord has asserted that such consent was sought or given in this instance. See Blaurock's Exhibit A, Article 8.5. In conjunction with its motion, Blaurock has submitted a repair estimate

for this damage and seeks recovery of the $3,950 it would require to fix its storefront.

E.C.K.E., L.L.C., debtor's landlord at store number 397, seeks entry of an order compelling debtor to pay all outstanding post-petition rent. Included in its rent are estimated CAM charges, estimated real estate taxes, a damage repair claim for damage caused to its storefront, late fees, and attorney's fees for all post-petition actions. Here also, debtor's store is located in the state of Illinois which has the practice of billing real property taxes in arrears. At the time of filing its motion, landlord had only estimates of the fourth quarter CAM charges and the 2001 real estate taxes. At a hearing held on this matter on January 8, 2002, E.C.K.E. submitted a revised estimate of those same charges it seeks as administrative expenses. Landlord did not, however, submit a copy of its lease with debtor, so this Court is unable to determine if the lease addresses how these "other rent" payments are to be billed.

Debtor's landlord for its West Allis, Wisconsin store, NDC, LLC, also seeks payment of all post-petition "other rent" charges. This landlord pleads, in the alternative, that the Court direct debtor to vacate the premises should payment not be made by debtor. NDC, LLC seeks payment of CAM fees assessed July 14th, November 6th and December 11, 2001 and real estate taxes billed on December 15, 2001. Debtor's landlord also seeks payment for what it terms underpaid rent for the period of August 1 to December 31, 2001. Here again, this landlord did not include a copy of its lease with debtor, and as a result, we cannot determine if an existing lease provision governs how each of these charges are billed or assessed.

Holiday Bowl Midwest, lessor for debtor's store number 392 seeks payment from

debtor of past-due rent and real estate taxes. This landlord also sought payment for repairs to its storefront, but that matter has since been resolved by the parties. Holiday Bowl Midwest did not file a copy of its lease with debtor with its motion, therefore, we are unable to establish whether any lease terms govern the various payments lessor seeks.

Several landlords jointly filed a motion seeking an order compelling debtor to pay all amounts owing and compelling debtor to assume or reject their leases. One landlord is Gateway Virginia Properties, Inc. (hereinafter "Gateway") and it holds a lease with debtor for store number 244 located in Aurora, Illinois. U.S. Retail Partners is the landlord for debtor's store number 385 located in Niles, Illinois and store number 313 located in Bensenville, Illinois. 75th & Lymon Corporation owns Darien Towne Centre and leases store number 229, located in Darien, Illinois, to debtor. These landlords have provided figures in their motion as to the amounts owing from debtor. They state that such amounts accrued post-petition but provide no information as to whether these totals include CAM charges or real estate taxes. Further, no copies of the relevant leases have been provided to the Court to aid its determination of when certain charges may be deemed as accruing under the lease.

Debtor leases store number 735 from Seventh–Sixth Street, L.L.C. which store is located in Milwaukee, Wisconsin. Seventh–Sixth Street seeks payment as an administrative expense of monthly real estate tax assessments, cost of insurance that debtor is required to carry on the property, late fees, interest on unpaid rent, cost of repairs needed at the location, and attorney's fees for bringing this action. The landlord has attached a copy of its lease with debtor whereby the tenant is responsible for all such fees claimed by the landlord. See Seventh–Sixth Street Exhibit 1. From this lease, we note that debtor is required to pay on a monthly basis its pro rata share of real estate taxes that are estimated by the landlord.

Debtor's landlord at its distribution center for its auto parts and supplies in the Chicago Market also seeks payment of its rent, late fees and real estate taxes. The landlord for this site, Chicago Trak, L.L.C., argues the Court should adopt the billing method in calculating the portions of its real estate taxes that may be paid as an administrative expense.

Several landlords include in their motions the issue of a holdover tenancy. These landlords seek a determination of the effective date of rejection for their sites in addition to the "other rent" fees sought by the other landlords listed above. Debtor purports to reject by operation of law the following landlords: Ferebee Associates (store number 208), Pleasure House Shore Drive Associates (store number 207), Kemps River Corner Associates (store number 219), KMC Associates (store number 781), and Developers Diversified Realty Co. (store number 268). Debtor did not move to extend the assumption or rejection period for these landlords and as such argues that these leases were rejected by operation of law. However, these landlords assert that debtor's attempt to reject their leases as of October 31, 2001 is improper when the assumption or rejection period did not expire until November 5, 2001. One of these landlords, Ferebee Associates, was granted Christmas closing protection by order of this Court on September 12, 2001. Further, they argue, debtor did not turn over these locations to the landlords as of the rejection date and in some cases continues to store fixtures in these stores and has not removed its signage from these loca-

tions. We find the stores in this motion, other than Ferebee Associates, were rejected as of November 5, 2001.

As for the other objecting landlords, they include: Crown American Properties (store number 803), Nellis Corporation (store number 649), Federal Realty Investment Trust (store numbers 675, 608, 625, 646, and 653), The Inland Real Estate Group, Inc. (store numbers 241, 245, 306, 328, 243, and 315), Indianwood, L.P. (store number 246), Mt. Pleasant Plaza (store number 736), Atlas Partners (store number 337), Ramco Gershenson (store number 611), and Eastside Associates, Ltd. (store number 324). Of these landlords, we have already denied debtor's proposed assumption and assignment as to the Ramco Gershenson lease. *See In re Trak Auto Corporation,* No. 01–72167 (Bankr.E.D.Va. Jan.9, 2002). The remaining landlords seek an order stating that debtor's rejection of these leases is not effective until the stores are turned over to the landlords meaning that the store is returned vacant or debtor is deemed to have abandoned any remaining property in the store upon turnover of the keys. As a corollary to this order, landlords seek language that until effective rejection, debtor is liable for all rents and other charges that accrue. Many of these stores have what has been termed "Christmas closing protection" because they were not to be rejected until after the holiday season, specifically, debtor could not reject these sites prior to January 31, 2002.

By order on September 4, 2001, debtor rejected leases held with LaValle Associates, LLP (store number 263), FAML Associates (store number 206), and Wilson Village Associates (store number 215). However, these landlords assert that debtor continues to store personal property in these locations which include signs, fixtures, and some hazardous substances. Although debtor has ceased operations at these locations, it has not turned over the stores absent its personal property. Specifically, at the time of its motion, debtor owed LaValle Associates for post-petition rent, utilities, real estate taxes, and interest on unpaid rent. Debtor owed FAML Associates for unpaid rent and late fees associated with same, and for the removal of debtor's debris at that location. The amounts owing to Wilson Village include unpaid rent, CAM charges, real estate taxes and fees for removal of property abandoned by debtor and removal of debtor's sign. The last landlord included in this motion is KMC Associates, LP, the landlord for store number 781 located in Fenton, Michigan. KMC asserts debtor owes it for unpaid rent, CAM charges, real estate taxes, and late fees. KMC states that it recovered possession of the premises, but will incur further costs in removing debtor's abandoned shelving and signage. All of these landlords seek administrative expense priority for all post-petition arrearages that accrued through the effective rejection date for each property, which they argue is the time of turnover even if the site was effectively deemed rejected on a date earlier than turnover.

The final issue we have before us is the assumption and assignment of one of debtor's "Chicago Market" locations. The store involved is number 331 located in the West Town Shopping Center. The landlord, LaSalle National Trust, N.A. (hereinafter "LaSalle"), has objected to the assumption and assignment of this location to A & E Stores arguing that such an assignment will violate debtor's lease and will disrupt its tenant mix. LaSalle argues that debtor was granted the right to operate only a Trak Auto store or an auto parts store. At issue is whether the language used in the lease is restrictive language such that it only applies to debtor and not to its assignee or whether said

language constitutes an exclusive use provision whereby debtor would not be permitted to assign this lease to A & E as it would violate the exclusivity built into the lease by LaSalle.

## CONCLUSIONS OF LAW

### I. Method of Calculating What Constitutes Pre–Petition and Post–Petition Charges

■ Under section 365(d)(3), the trustee or debtor-in-possession is required to "timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3). In other words, the debtor must perform all post-petition [1] obligations under its leases. As applied to the parties in this case, debtor must perform all obligations owing under its leases to the petitioning landlords which obligations include the payment of rent, real estate taxes and CAM charges.

The issue of when debtor's obligations accrue has caused a split of authority in the bankruptcy courts. The Bankruptcy Code does not define when debtor's obligations "arise" in order to determine when they must be treated as a post-petition claim entitled to administrative expense priority. This issue is further complicated by the fact that Illinois bills for its real estate taxes in arrears. Thus, for example, tax bills for the year 1998 are not billed until 1999 and even then are done in two installments. 35 ILL. COMP. STAT. 200/1–

155; 35 ILL. COMP. STAT. 100/21–30; 35 ILL. COMP. STAT. 200/20–210.

A minority of courts have adopted the "billing method" whereby all amounts owing a landlord become post-petition obligations as a result of the timing when the debtor receives a bill for those charges after the entry of debtor's order for relief. *See, e.g., Centerpoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 268 F.3d 205 (3d Cir.2001); *In re Koenig Sporting Goods, Inc.*, 229 B.R. 388 (6th Cir. BAP 1999); *Inland's Monthly Income Fund, L.P. v. Duckwall–ALCO Stores, Inc. (In re Duckwall–ALCO Stores, Inc.)*, 150 B.R. 965 (D.Kan.1993).

The majority of courts have adopted the "accrual method" of computing pre and post-petition obligations. Under this theory, debtor's obligations become post-petition obligations because they accrued during the post-petition period. For example, a bill for debtor's real estate taxes may be for a six month period and debtor's order for relief comes in month 4 of that billed period such that all taxes prior to the entry of the order for relief become prepetition obligations and all taxes thereafter are post-petition obligations.

■ The intent behind the enactment of § 365(d)(3) was to prevent landlords from becoming involuntary creditors of debtor's estate. Thus, "[a] landlord cannot be required to provide post-petition services without current payments for those services" as this would run afoul of the very purpose of the provision. *See In re Warehouse Club, Inc.*, 184 B.R. 316, 317

---

1. For clarification, the post-petition obligations referred to throughout this opinion reflect obligations debtor owes that arise after the order for relief is entered in the case, which may not be the same date as when the bankruptcy petition is filed. These obligations do not include those arising the day

the order for relief is entered—only those after the entry of the order for relief are properly termed post-petition obligations. *See generally In re Handy Andy Home Improvement Ctrs., Inc.*, 144 F.3d 1125, 1126 (7th Cir.1998).

(Bankr.N.D.Ill.1995). Another goal in enacting this provision was to "put landlords on an equal footing, not to grant them a windfall at the expense of other creditors." *Santa Ana Best Plaza, Ltd. v. Best Products Co., Inc. (In re Best Products Co., Inc.)*, 206 B.R. 404, 407 (Bankr.E.D.Va. 1997). Adopting a method where debtor's liability would turn solely on when bills are issued has the potential to create a windfall for a landlord who decides to manipulate when it bills the debtor for taxes and CAM charges so that the amounts due become a post-petition claim. This type of manipulation of debtor's expenses is not something this Court will encourage and is a practice which can only harm the debtor's efforts at achieving a successful reorganization.

One court, adopting the accrual method, has described debtor's real estate taxes as "a sunk cost, not a current expense of allowing the debtor to remain in possession." *In re Warehouse Club, Inc.*, 184 B.R. 316, 317 (Bankr.N.D.Ill.1995). The court went on to state as a corollary that "debtor's continued occupancy did not increase the landlord's burden for last year's taxes or make the landlord an involuntary creditor for those taxes." *Id.* The accrual method confirms the fresh start purpose of the bankruptcy laws in that bankruptcy allows a debtor to "ignore sunk costs—treat bygones as bygones" in the hopes that debtor will yield an overall economic strengthening. *See In re Handy Andy Home Improvement Centers, Inc.*, 144 F.3d at 1127. Judge Posner stated most eloquently the rationale behind the accrual method:

What [the debtor] wanted was the continued occupancy of the leased property until it rejected the lease. To get this benefit it had to pay the full rent under the lease for every day that it continued to occupy the property; section 365(d)(3) ... requires no less. But [debtor's] debt to [the landlord] for 1994 and earlier 1995 taxes relates entirely to an earlier period, and is thus no different from its debts to trade creditors for supplies that it bought in 1994 and never paid for.

*Id.* We note that the leased site involved in that case was one in Cook County, Illinois—where real estate taxes are billed in arrears. The landlord in *In re Handy Andy* faced the same predicament as many of the landlords in this case in that all had substantial real estate taxes owing from the debtor due to the Illinois method of billing for taxes in arrears.

■ Based upon the fairness that results from the accrual method, we adopt that approach to the debtor's liability to its landlords.[2] Chief Judge Tice set forth the methodology in *In re Best Products Co.:* "debtor's obligation under the lease to pay its share of real estate taxes as 'additional rent' accrues on a daily basis and that, under § 365(d)(3), post-petition bills must be prorated so that the debtor pays as an administrative expense only those charges which accrued during the post-petition, pre-rejection period." *In re Best Prods. Co., Inc.*, 206 B.R. at 407. The court went on to state that this same theory would also apply to other post-petition charges that constitute "additional rent" such as CAM charges. *Id.*

**2.** We note that the Fourth Circuit has not directly confronted the issue presented today. However, in an unpublished opinion, the court apparently adopted the billing method due to the contractual language contained in the leases. *See Rose's Stores, Inc. v. Saul*

*Subsidiary I, L.P. (In re Rose's Stores, Inc.)*, 155 F.3d 560, 1998 WL 393984 (4th Cir.1998) (unpublished table opinion). As an unpublished decision, it is not binding authority for this Court pursuant to Rule 36 of the U.S. Court of Appeals for the Fourth Circuit.

 Thus, the order for relief entered after the filing of a chapter 11 bankruptcy petition is the point that separates the pre-petition claim from the post-petition claim. This rule holds true for numerous aspects of debtor's case and most importantly here, is the point which differentiates debtor's pre-petition liability for real property taxes and CAM charges from its post-petition liability for those same fees. Anything accruing after the entry for the order for relief is a post-petition charge that may be elevated to administrative priority under § 507(a). We hold this proposition applies regardless of the terms in debtor's leases. Further, the amount claimed must be for an actual expense and cannot be based on an estimate of debtor's liability for the fees associated with its leases and operations, for an expense cannot accrue without the amount being known.

## II. Debtor's Rental Obligations

 Debtor allegedly did not vacate and surrender the premises of several leased sites by the effective date of rejection. By maintaining occupancy of the store after the rejection period, debtor becomes a holdover tenant. Debtor may end its holdover status by tendering possession back to its landlord or the landlord's agent. In cases where debtor has not physically been in the premises but where many of its possessions, such as shelving or signage, have remained in and on the location, debtor must take affirmative steps to notify the landlord that it surrenders the site and any remaining property is abandoned to the lessor, unless sooner removed by the debtor. During the holdover period, the burden is on the debtor to make the lessor aware of its surrender of possession.

### A. Debtor's Liability for Post–Petition Rent

Several landlords argue that debtor's rejection of their leases should be deemed effective upon turnover of the premises and that the date specified in the order deeming each site rejected is not to the effective rejection date because the debtor did not vacate the premises by the rejection date set out in the order.

 This issue is governed by § 365(d) which provides in relevant part:

(3) The trustee shall timely perform all obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60 day period....

(4) Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

As an initial matter, we find that if a lease is not assumed or rejected within the 60 days following the entry of the order for relief, such lease is rejected as a matter of law. 11 U.S.C. § 365(d)(4). Further, any lease that was the subject of an order extending the time to assume or reject the lease must also be assumed or rejected within the specified period or it is also deemed rejected by operation of

§ 365(d)(4). The final limitation we find it necessary to set in this area concerns the various orders rejecting or assuming the subject leases. When an order is entered by this Court rejecting one of debtor's leases, the effective date of rejection provided in the order will govern. The issue of rejection does not turn on when the debtor turns the keys over to the landlord but is a matter of court order or alternatively, a lease is rejected by operation of § 365(d)(4). This is not to say that when a debtor remains in the premises after the effective date of rejection that debtor is absolved of any liability for charges that accrue post-rejection. That issue is discussed more fully *infra*.

■ Until debtor's leases are rejected, debtor is required to pay rent to the landlord from the date the bankruptcy petition is filed until the date the lease is rejected. This principle is established by the Code in § 365(d)(3) which requires the trustee, or as in this case, debtor-in-possession to timely perform all obligations under the lease. Failure to pay rent and other obligations contained in the lease gives rise to an administrative claim by the landlord. *See In re Virginia Packaging Supply Co.*, 122 B.R. 491 (Bankr.E.D.Va.1990); *see also In re Geonex Corp.*, 258 B.R. 336 (Bankr.D.Md.2001).

A split of authority has developed over whether a benefit to the estate need be proven in order to collect the full amount of rent as contained in the lease agreement as an administrative expense. The majority of courts have held that § 365(d)(3) does not require the lessor to show a benefit to the estate in order to prevail on an administrative rent claim for post-petition rent. *See, e.g., Norritech v. Geonex Corp. (In re Geonex Corp.)*, 204 B.R. 684 (D.Md.), *aff'd*, 120 F.3d 261, 1997 WL 471105 (4th Cir. 1997); *see also Thinking Machines Corp. v. Mellon Fin. Servs. Corp. (In re Think-*

*ing Machines Corp.)*, 67 F.3d 1021 (1st Cir.1995); *In re Pacific–Atlantic Trading Co.*, 27 . F.3d 401 (9th Cir.1994); *In re Pudgie's Dev. of NY, Inc.*, 239 B.R. 688 (S.D.N.Y.1999); *In re Twigland Fashions, Inc.*, 198 B.R. 199 (W.D.Tex.1996); *In re F.A. Potts & Co., Inc.*, 137 B.R. 13 (E.D.Pa.1992); *In re Eastern Agri–Systems, Inc.*, 258 B.R. 352 (Bankr.E.D.N.C. 2000); *In re International Ventures, Inc.*, 215 B.R. 726 (Bankr.E.D.Ark.1997). These courts hold that the phrase "notwithstanding section 503(b)(1)" means " 'irrespective of whether payments required under the lease meet the usual requirements for administrative status, reasonableness and benefit to the estate, they are unconditionally due.' " *In re Pudgie's Dev. of NY, Inc.*, 239 B.R. at 692 (quoting *In re Wingspread Corp.*, 116 B.R. 915, 926 (Bankr.S.D.N.Y.1990)).

The minority view interprets § 365(d)(3) differently. Those courts following the minority view hold § 365(d)(3) does not abrogate the requirements imposed by § 503(b)(1). Thus, if a debtor-in-possession or trustee fails to fulfill its obligations under § 365(d)(3), the amount of the lessor's claim is determined by § 503(d)(3) which requires a showing of a benefit to the estate before awarding a claim administrative priority. *See, e.g., Broadcast Corp. of Ga. v. Broadfoot*, 54 B.R. 606 (N.D.Ga.1985).

We adopt the majority view and find that the lessor is not required to show debtor's continued possession of its space is a benefit to the estate. The minority interpretation of § 365(d)(3) turns the very language contained in that provision on its head. The statute specifically provides that its provisions apply "notwithstanding section 503(b)(1)." 11 U.S.C. § 365(d)(3). Further, the legislative history that accompanies the enactment of the landlord protection provisions found in § 365 indicates

that Congress sought to provide special protections to lessors of a debtor. *See* 130 Cong. Rec. S8894–95 (daily ed. June 29, 1984) (statements of Sen. Hatch). Debtor's continued occupation of the property confers some benefit to the estate as debtor is either using the space to further enhance the estate by continuing its operations, or enhancing the estate by avoiding the costs of storing and moving its equipment. The price of the administrative claim also "represents the price of the trustee's opportunity to take 60 days, or in this case 120 days, to decide whether the lease is beneficial to the estate and should be continued." *In re Geonex Corp.*, 204 B.R. at 691 (citation omitted).

The debtor in the case *sub judice* still has not decided whether it will assume or reject all of its leases governed by the latest time extension granted by this Court. Debtor must pay the landlords the amounts owing each month under its various leases as a price of taking the time it has sought to make these decisions. This is so despite the fact that debtor may no longer be operating its store. The fact that debtor has not rejected a lease but has retained possession of it is enough for an administrative claim to accrue should debtor fail to pay its rent. *See, e.g., In re Eastern Agri–Systems, Inc.*, 258 B.R. at 354 ("[D]ebtor remains responsible under §§ 365(d)(3) and (10) even if the leased property is never used and is of no benefit to the estate."); *In re F.A. Potts & Co.*, 137 B.R. at 17 ("The leased premises are considered necessary even if they are not being put to the same use as they were prior to the debtor filing for bankruptcy.").

■ In determining the amount that debtor owes to each landlord, the settled rule in this District is that the contract rate of rent is the reasonable value for debtor's use and occupancy of the premises. *See In re Williams Contract Furni-*

*ture, Inc.*, 148 B.R. 799, 804 (Bankr. E.D.Va.1992). The debtor did not present any evidence regarding the worth of any of the rejected sites at the hearing on this matter. Thus, we hold the value to be used by each landlord is the contract rate of rent and other charges as are found in each lease. This holding, however, only applies to the post-petition pre-rejection period for each of debtor's leases. Therefore, for the lessors that have raised this issue and are the subject of orders rejecting their respective leases or for those landlords whose leases were rejected by operation of law, debtor must pay the amount specified in each of its leases, with amounts owing for post-petition taxes and CAM charges, or amounts considered as "other rent" to be paid as set forth *supra* under the accrual approach.

## B. Debtor's Liability for Rent During the Holdover Period

■ When the debtor becomes a holdover tenant under a lease, the administrative expense that accrues from debtor's continued use of the premises is treated differently than pre-rejection administrative expense claims. Claims for rent and other charges that accrue after the date of rejection and while debtor remains in possession of the premises fall under § 503(b) which states:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> > (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case. . . .

This District has previously held "once a lease is rejected . . . if the debtor remains in possession by failing to vacate the premises, the estate becomes liable to the lessor

for an administrative expense claim arising from the benefit accruing to the estate for the continued use of the estate." *In re Williams Contract Furniture, Inc.,* 148 B.R. at 804 (citation omitted); *see also In re Virginia Packaging Supply Co., Inc.,* 122 B.R. at 494 ("Any obligations occurring after the date of rejection was approved shall be governed by § 503(b)."). During the holdover period, the amount of the administrative rent claim is determined by the rental rate set forth in the contract. *See In re Williams Contract Furniture, Inc.,* 148 B.R. at 804. This, however, is a presumption which debtor can rebut by demonstrating the reasonable worth of the premises.[3] *Id.*

### C. Length of the Holdover Period

The next issue requires the court to establish the period of time that constitutes the holdover period. Certainly, debtor is liable for rent accruing while in actual possession of the premises. However, we must determine whether debtor is liable for the entire month of rent, regardless of the number of days spent in occupancy or if lessor's administrative claim may only include those days which debtor actually had possession.

As a court of equity, we must also consider the various underlying policies behind a decision to adopt either approach. Thus, if debtor were to be held liable for the entire month of rent, no matter how long or short it retains possession during that month, it may cause a hardship on the debtor who extends possession by a matter of a few days, whereas this policy may be more equitable for the debtor who occupies the premises for virtually the whole month. Further, we must consider the impact on the lessor by the debtor's retention of possession. If debtor stays for two days and is only liable for rent for those two days, then lessor loses the rest of the month's rent and possibly a new tenant by debtor's continued occupancy.

We find an inherent conflict between the requirements of § 503(b) and the terms contained in most leases with rent to be paid monthly and in advance. When such a conflict arises, we must follow the statute on point. Thus, § 503(b) authorizes as an administrative expense only those amounts that are "actual [and] necessary costs and expenses of preserving the estate" which we interpret to mean only charges for the time that the debtor actually remained in possession of the premises. *See In re National Record Mart, Inc.,* 272 B.R. 131, 135 (Bankr. W.D.Pa.2002) (Holding that debtor was liable for two days of rent for time debtor occupied the premises after rejection of the lease). As a result, debtor's post-rejection liability is limited to those days it occupied the subject premises regardless of a showing of benefit to the estate, which means lessor's administrative expense is the number of days debtor actually retains possession, multiplied by the daily cost of leasing the space (total monthly rent charges divided by the number of days in the month).[4] *See In re Williams Contract Furniture,* 148 B.R. at 804–05.

---

**3.** For example, some courts have accepted debtor's evidence and ordered that a reduced rate was to govern the post-rejection period. *See, e.g., In re International Ventures, Inc.,* 215 B.R. 726, 728–29 (Bankr.E.D.Ark.1997) (Based on evidence submitted, court found administrative claim amount was to be based on a reasonable storage cost for the area, thereby reducing the claim to approximately $410 per month for the holdover period.). These cases often arise when debtor has essentially closed its store at that location and uses the premises merely for storage.

**4.** We note that while Judge Shelley found an actual benefit to the estate in awarding the administrative expense claim to the lessor in *In re Williams Contract Furniture, Inc.,* that

### III. Timing of Payment for the Resulting Administrative Claims

■ The final issue that has caused great concern for this Court as well as the landlords is the timing of payment on these administrative claims. Until very recently, since the filing of its petition debtor has been in default with virtually all of the landlords at issue here, despite repeated orders from this Court to timely pay all of its rental obligations.

While § 365(d)(3) requires debtor to timely fulfill all of its obligations on its executory contracts for nonresidential real property, this provision does not provide a remedy for debtor's noncompliance. This issue has caused great debate among the courts because an order for immediate payment may be construed as granting landlords super-priority status at the expense of similarly situated creditors, such as debtor's trade creditors.[5] *See generally In re Virginia Packaging Supply*, 122 B.R. at 494–95; *In re Pudgie's Dev., Inc.*, 239 B.R. 688; *In re New Almacs, Inc.*, 196 B.R. 244 (Bankr.N.D.N.Y.1996).

■ Judge Tice, in *In re Virginia Packaging Supply Co.*, held that administrative expenses that arise under § 365(d)(3) should be assigned the same priority as administrative expenses under § 507(a). This same approach has been adopted by the majority of courts to consider this issue. *See, e.g., In re Virginia Packaging Supply*, 122 B.R. at 494–95; *In re Pudgie's Dev., Inc.*, 239 B.R. 688; *In re Rare Coin Galleries*, 72 B.R. 415 (D.Mass. 1987); *In re New Almacs, Inc.*, 196 B.R. 244. While the Congressional intent behind § 365(d)(3) was to provide greater protection to nonresidential real property landlords by requiring timely payments of lease obligations, these Code revisions did not create a special category of higher priority claims for lessors when a debtor does not comply with the order requiring timely payment of rent charges. One court explained this result by differentiating between the landlord's claim for accrued and unpaid rents and the landlord's right to timely payment under the Code:

> Section 365(d)(3) advances the landlord to the head of the line for current payment of ongoing expenses in recognition of his unique, involuntary creditor status. And, as with other post-petition payments essential for the continued operation of the debtor's business, such as for supplies, utilities, employee wages and the like, these payments are not subject to recapture. But once the land-

---

no such finding is required in this case. We do so in order to discourage the holdover tenant/debtor situation. To apply the actual benefit line of cases would allow the debtor to holdover without any consequence in the case where debtor merely has not cleared out its few remaining items at the location, yet lessor is deprived of possession of its space. In as much as debtor must pay pre-rejection rent without a finding of actual benefit, so must debtor pay post-rejection rent without a similar showing as this amount reflects debtor's decision to continue use of the premises despite its promise to vacate. This, however, is not meant to discourage in any way the lessor's acts to utilize other remedies to regain possession of its space. The lessor must not sit on its rights and merely rely on a post-

rejection administrative claim award. Also, debtor is not precluded from trying to reduce its liability by presenting evidence as to the reasonable rental rate for its use of the premises.

**5.** A similar debate has focused on whether the court *can* even award immediate payment of these rental obligations where debtor is administratively insolvent. *See In re Pudgie's Dev. of NY, Inc.*, 239 B.R. 688 (S.D.N.Y.1999) for a lengthy discussion of this issue. However, despite a few allegations that debtor may be reaching administrative insolvency, this issue has not been presented to us, therefore, we will not address this debate in rendering our decision.

lord allows his *right* to timely payment to lapse into an accrued liability for unpaid rents, Section 365(d)(3) becomes irrelevant. The accrued liability for rents is no more than the landlord's lapsed right. A *claim* comes into existence on the basis of that accrued liability, but Section 365(d)(3) does not purport to establish claim priority. The statute does not allow the landlord to permit his right to lapse into a claim for accrued amounts, and later attempt to assert the claim on a superpriority basis ahead of other administrative or superpriority creditors.

*In re Pudgie's Dev. of NY*, 223 B.R. 421, 427 (Bankr.S.D.N.Y.1998). We find this reasoning persuasive and agree that the remedy for untimely performance under § 365(d)(3) is not super-priority. Another policy reason behind this holding is to encourage the lessors to be proactive in asserting their rights. A landlord may move to compel payment of pre-rejection rent under § 365(d)(3) or may seek to lift the automatic stay under § 362 to pursue other remedies. However, a landlord is not permitted to sit on its rights and rely on an alleged super-priority status for its administrative rent claim. *See id.*

As applied to the matters *sub judice*, each petitioning landlord is entitled to a pre-rejection claim for rental obligations that remain outstanding and such claims will be awarded administrative priority as defined under § 507(a). To the extent applicable, landlords of the premises subject to the post-rejection retention of possession by debtor are awarded administrative claim priority status for the relevant post-rejection period. We will not determine the specific date of debtor's surrender of the premises where it has retained possession post-rejection as we do not have evidence before us sufficient to make those individual determinations.

## IV. Attorney's Fees, Late Charges and Interest

Many of debtor's leases contain provisions for the payment of the lessor's attorney's fees when the lessor prevails in litigating its claim. Debtor's leases also frequently provide for the assessment of a late fee for rent that is not timely paid or the lease may simply assess interest to the rental amount that is delinquent which accrues until the payment of that rent.

 Where the debtor's lease provides for the payment of counsel fees and late fees or interest, we will uphold the terms of the contract. Debtor must pay for the lessor's attorney's fees as part of the requirements contained in § 365. When debtor assumes a lease, it must assume the entire lease, which includes provisions contained in a lease that award a lessor attorney's fees. *See Three Sisters Partners LLC v. Harden (In re Shangra-La, Inc.)*, 167 F.3d 843 (4th Cir.1999). Further, it must cure all defaults, which under the terms of the lease may be defined to include the payment of counsel fees. Debtor may also be required by state law to reimburse the lessor for its counsel fees incurred in enforcing its lease. *See In re Geonex Corp.*, 258 B.R. 336, 340 (Bankr.D.Md.2001) (Lessor "is also entitled under applicable state law and the terms of the lease to the reimbursement of all of the counsel fees it was required to expend to enforce its right to payment of rent, from the petition date down to the present.").

Late fees and interest provided on delinquent rent in debtor's leases will similarly be enforced by this Court. Leases commonly provide for the assessment of a late fee or interest on rental payments received by lessor in an untimely fashion. Frequently, these fees and charges become part of the rent that is owed by the lessee

to the lessor. As such, they become part of the rent that is owed to the lessor and part of the administrative claim the lessor holds for debtor's failure to timely perform all of its obligations under the lease as required by § 365(d)(3). Without further evidence before us, we decline to address whether interest may be properly chargeable to the debtor for past due rent under applicable state law. *See In re Geonex,* 258 B.R. at 342–343 (Holding that although the Bankruptcy Code does not specifically allow for interest on untimely rent payments, applicable state law allows for the assessment of interest until the rent is paid at the rate set for interest on judgments awarded in that state).

This holding also applies to damage repair costs that the lessor must incur from the debtor's use of the property. If the lease provides for the repair of any damages as a condition of vacating the premises or of ending the lease, however damages may be defined in the lease, we will uphold those provisions and enforce them if necessary. The same applies to any charges assessed due to debtor's noncompliance with the turnover terms of its lease.

Debtor is liable for all of these extra fees that may be found in any of its numerous leases regardless of whether the debtor is a holdover tenant or not. This holding also applies to late charges for overdue rent, interest, and attorney's fees merely if debtor rejects the lease and timely vacates.

## V. Exclusive Use or Restrictive Use Clause in Debtor's Lease for Store Number 331

Debtor has moved to assume and assign its lease for store number 331 to A & E Stores. We must interpret the relevant clauses in debtor's lease with this landlord to determine whether the language contained therein is restrictive as to debtor only or is exclusive, meaning debtor's assignee is also bound by its terms. The landlord has objected to the assumption and assignment of its lease with debtor arguing that such an act would violate debtor's lease, would disturb its tenant mix and would effectively rewrite its lease with the debtor. Debtor and its post-petition lender, Congress Financial Corporation, argue that the lease clause is merely a restrictive use clause and that to hold otherwise would effectively create a non-assignable lease in contravention of § 365(f)(1). Further, debtor disputes the impact upon the landlord's tenant mix.

### A. Protections Afforded to Shopping Center Landlords

Owners of shopping centers are afforded special statutory protections in the form of adequate assurance of future performance under Bankruptcy Code § 365(b)(3), which provides:

adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radium,

location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

These provisions are peculiar to the shopping center landlord and do not have broader application. The parties do not dispute that this is a shopping center and that § 365(b)(3) applies.

### B. Debtor's Lease

■■■■■ In assuming a commercial real property lease, debtor must take the contract subject to all existing terms and conditions. *See Thompson v. Texas Mexican Railway Co.*, 328 U.S. 134, 141, 66 S.Ct. 937, 90 L.Ed. 1132 (1946) ("Contracts adopted by [debtor] are assumed *cum onere*."); *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 172 (Bankr. E.D.Va.1993) (same). Thus, we cannot rewrite debtor's lease or excise restrictive use clauses. Further, under Illinois law, lease provisions are strictly construed against the lessor. *See National Bank of Albany v. S.N.H., Inc.*, 32 Ill.App.3d 110, 336 N.E.2d 115, 123 (1975).

The landlord's argument is somewhat rebutted by the terms of its own lease. Debtor's lease provides in subsection 1.1.L "PERMITTED USES: Sale at retail of automobile parts and accessories and such other items as are customarily sold by Tenant at its other Trak Auto stores." LaSalle National Trust's Opposition to Debtor's Motion to Assume and Assign ("LaSalle's Opposition"), 2d Exhibit E. In addition, the lease provides affirmative covenants in Article VIII, Section 8.1.B where debtor covenants "to use the Leased Premises only as a Trak Auto Store and for the Uses provided in Section 1.1(L)"; to operate its business in the Leased Premises under Tenant's Trade Name . . . . LaSalle's Opposition, 2d Ex. E. However, the lease also contains what the debtor and Congress Financial term a free assignability clause.[6] Hence, if the lease is freely assignable, it would be impossible to maintain the exclusivity the landlord asserts exists in the terms of its lease.

First, we disagree with Congress Financial and the debtor that the lease provision is one allowing free assignability. The lease, as written contains restrictions on debtor's ability to assign it to a third party. While the terms of the contract are generally given force and effect, we find such terms cannot be enforced under the Bankruptcy Code. Section 365(f)(1) prohibits restrictions on the assignability of an unexpired lease.

■■■■ Sections 365(b)(3) and 365(f) must be read in conjunction. While § 365(b)(3) instructs that debtor must assume a lease with all of its present terms and provides for adequate assurance to the landlord of a shopping center, terms that violate the bankruptcy laws cannot be enforced by the

---

**6.** Debtor's lease for store number 331 states that debtor may freely assign or sublease its space:

to any corporation which is owned by or closely affiliated [with (sic.)] the Dart Group Corporation, . . . or to any corporation succeeding to substantially all the assets of Tenant. . . . In the event of an assignment or a sublease made in accordance with this paragraph, the assignee or subtenant may use the Leased Premises for any lawful use, provided that such use is not for the same primary use, or does not directly conflict with the exclusive rights of another tenant of the Shopping Center and provided such use does not violate Section 8.2.B [covering unlawful or harmful uses of premises].

Debtor's Exhibit 1, from the hearing held January 11, 2002.

Court. Section 365(f) specifically provides that anti-assignment clauses are not to be given effect. Thus, lease provisions that prohibit assignment outright will not be enforced by this Court. *See generally In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D.Del.1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").

## C. Tenant Mix

The landlord raises the issue of its tenant mix and argues that assignment to A & E Stores would disrupt its tenant mix and violate exclusivity provisions held by other tenants in their leases with landlord. Debtor and Congress Financial dispute the landlord's assertion of a great impact on its tenant mix.

The issue of tenant mix is governed by § 365(b)(3) and by the particular lease at issue. Yet, the court's inquiry is not directed by general notions of tenant mix. *See In re Ames Department Stores*, 121 B.R. 160, 165 (Bankr.S.D.N.Y.1990) ("The statute itself thus directs tenant mix inquiry to contractual provisions rather than general notions of tenant mix . . . ."). In keeping with general rules of contract construction, the court is also not to read into the lease additional terms not contained therein. What § 365(b)(3) requires is that "a shopping center tenant [be held] to its bargain with a landlord and to leave intact the property interests of debtor and landlord as set forth in that bargain, the courts should not imply an additional non-bargained-for-term." *In re Ames Department Stores*, 127 B.R. 744, 753 (Bankr. S.D.N.Y.1991).

Debtor's lease does require that any assignment first be approved by the landlord, and also that any proposed assignee not violate the exclusivity provisions contained in any of the other tenants' leases. Debtor's Exhibit 1 from hearing held January 11, 2002. During the hearing on this matter, landlord's counsel submitted a general schematic of the layout of this shopping center that listed its various tenants. This, however, was never admitted into evidence but merely tendered to the Court during the course of the hearing. In support of its opposition to debtor's assumption and assignment, the landlord submitted an affidavit from the person in charge of all operations at this center. Attached to this affidavit are several excerpts from the leases purportedly held by other tenants in this shopping plaza. We find first that while these exhibits are informative, they are not part of the formal record of evidence established during the hearing on this matter. Second, these lease excerpts all appear to contain language similar to that in debtor's lease which generally states what constitute "permitted uses" of the landlord's premises. These clauses do not constitute exclusivity provisions and even if they were to do so, we could not consider such excerpts as they are not part of the formal record before the Court.

However, we are concerned with the due process that was afforded to this particular landlord. This matter was originally noticed and set for hearing for January 8, 2002. At the hearing on January 8th, the matter was continued for a hearing on January 11th, which continuance was requested on January the 8th. Counsel for LaSalle was not present at the January 8 hearing as debtor's counsel advised him the day before that they would withdraw their motion to assume and assign as none of the bids met the cure amount for this location. Circumstances apparently

changed after discussing the matter with LaSalle's counsel, because debtor appeared on the 8th and did not withdraw the motion. Debtor's counsel stated that late in the day on January 7, debtor received a higher bid for this location that would cover the cure amount required to assume the lease and still leave debtor with money to further benefit the estate. It is unclear exactly when LaSalle or its counsel was made aware of this higher bid. At the hearing on January 11, we noted our concerns with how this and another similarly situated lease were being handled. We do not take matters of due process lightly.

As a result of the conflicting and confusing messages LaSalle was receiving from the debtor and its counsel, we will duly consider a motion from LaSalle to reconsider this holding based on its desire to put on its own evidence at a later hearing. Any such motion from LaSalle must be filed within 10 days of the entry of this order. The parties should note that if LaSalle seeks to amplify the record on its behalf, such evidence may or may not change the outcome of our ruling today. At any such hearing, debtor may present additional or rebuttal evidence relative to the subject leased premises.

### CONCLUSION

In summary, we hereby adopt the accrual method to determine debtor's liability for all post-petition expenses. Further, debtor is ordered to comply with all terms of its leases provided such terms do not conflict with the Bankruptcy Code. Debtor's lessors are entitled to other charges as allowed under the terms of their respective leases and these charges may include late fees, interest as discussed herein, and attorney's fees. All of the administrative claims in this case are to be paid according to the priority set forth in § 507(a). Final-

ly, the Court is concerned by the due process given to debtor's lessor LaSalle and hereby grants it authority to seek rehearing within 10 days of the entry of this order on the assumption and assignment of its store to A & E Stores so that it may present evidence on its behalf.

IT IS SO ORDERED.