**In re VALLEY MEDIA, INC., Debtor.**

No. 01–11353(PJW).

United States Bankruptcy Court, D. Delaware.

Feb. 21, 2003.

Steven K. Kortanek, James E. Huggett, Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Wilmington, DE, Robert D. Nachman, Joni M. Green, Schwartz, Cooper, Greenberger & Krauss, Chtd., Chicago, IL, for MIT Unsecured L.P.

Robert J. Dehney, Michael G. Busenkell, Christopher M. Winter, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Valley Media, Inc., Debtor and Debtor in Possession.

William P. Bowden, Ashby & Geddes, Wilmington, DE, Jonathan N. Helfat, Otterbourg, Steindler, Houston & Rosen,

P.C., New York City, for Congress Financial Corporation (Northwest).

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the motion filed by MIT Unsecured L.P. ("MIT"), a lessor of real property, for allowance and immediate payment of real estate taxes pursuant to 11 U.S.C. § 365(d)(3) as an administrative expense claim for a lease obligation arising post-petition (Doc. # 989). For the reasons set forth below, the motion will be granted.

## BACKGROUND

Valley Media, Inc. ("Debtor") entered into non-residential real property lease ("the Lease") with MIT for premises at the Jefferson Riverport International Industrial Park ("the Premises"), located in Louisville, KY, on September 25, 1997. Section 12.1 of the Lease required the Debtor to pay "all real estate taxes ... levied against the Premises ... as they shall become due and payable." The local real estate taxes levied against the Premises follow a calendar-year cycle and taxes for each year of the Lease became due on the thirty-first of December of that year. Thus, real estate taxes for calendar year 2001 became due on December 31, 2001.

Debtor filed its Chapter 11 petition on November 20, 2001 ("Petition Date"). Debtor remained in possession of the Premises until the Lease was rejected on May 21, 2002, effective as of April 30, 2002 ("Lease Rejection Date"), pursuant to court order. The real estate taxes that came due on December 31, 2001 were in the amount of $88,806.38, and were paid by MIT, as permitted under the Lease. Debtor ultimately made a prorated post-petition payment to MIT of $9,975.71, representing the period from the Petition Date through December 31, 2001. MIT asserts it is entitled to immediate reimbursement of the remaining $78,830.67 of the 2001 tax bill pursuant to § 365(d)(3) of the Bankruptcy Code.[1]

## DISCUSSION

■ MIT asserts that the plain meaning of § 365(d)(3) requires the Debtor to pay all post-petition but pre-rejection (the "pre-rejection period") obligations arising under a nonresidential real property lease. MIT also asserts that it is entitled to an administrative expense claim that should be paid immediately. Section 365(d)(3) provides, in relevant part:

> The trustee shall timely perform *all the obligations* of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. § 365(d)(3) (emphasis added).

■ The purpose of § 365(d)(3) is to protect landlords by requiring debtors to timely perform their obligations arising under the lease. With regard to rent, courts generally agree that § 365(d)(3) requires debtors to pay rent obligations in full and without proration as they come due in the pre-rejection period. *See Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc.),* 203 F.3d 986 (6th Cir.2000) (holding lessor entitled to full month's rent when rent due on first of month and lease rejected on second); *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.),* 27 F.3d 401 (9th Cir.1994) (finding administrative claim for full amount of pre-rejec-

---

1. The Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* is hereinafter referred to as " § _____."

tion period rent). *But see In re Mr. Gatti's, Inc.*, 164 B.R. 929 (Bankr.W.D.Tex. 1994). With regard to taxes, however, courts have split as to whether the obligation must be paid in full or in part, resulting in Debtor's assertion that I must look to the legislative history of § 365(d)(3). *Compare In re Krystal Co.*, 194 B.R. 161 (Bankr.E.D.Tenn.1996) (adopting "billing date" or "performance date" approach and requiring debtor to pay all taxes that came due in the pre-rejection period) with *In re Handy Andy Home Improvement Centers, Inc.*, 144 F.3d 1125 (7th Cir.1998) (adopting proration or "accrual date" approach and holding that tax obligation arose piecemeal every day).

The Third Circuit, however, recently addressed this issue. It concluded that the plain language of § 365(d)(3) mandates that a billing date approach be used to determine when a lease obligation arises. *Centerpoint Properties v. Montgomery Ward Holding Corp.*, 268 F.3d 205, 211 (3rd Cir.2001). In *Centerpoint*, the court, though "with some reluctance," was "constrained to hold that § 365(d)(3) is not ambiguous. We thus have no justification for consulting legislative history." *Id.* at 210–12. The court nevertheless examined the legislative history and concluded it was "consistent" with its holding that "an obligation arises under a lease for the purposes of 11 U.S.C. § 365(d)(3) when the legally enforceable duty to perform arises under that lease," which in the matter

before me took place on the tax billing date of December 31, 2001.[2] *Id.* at 210–11. Thus, the court rejected the proration approach and held that, under § 365(d)(3), the obligation "must be fulfilled not in part, but in full." *Id.* at 212.

■ Having concluded that § 365(d)(3) is unambiguous, it is not surprising that *Centerpoint* cites *In re Koenig* with approval, as that case also holds that § 365(d)(3) means what its plain language states: the debtor must perform all lease obligations as they come due. This result is neither particularly odious nor burdensome. "Congress intended § 365(d)(3) to shift the burden of indecision to the debtor: the debtor must now continue to perform all the obligations of its lease or make up its mind to reject it before some onerous payment comes due during the pre-rejection period." *In re Krystal Co.*, 194 B.R. at 164.

Debtor, however, asserts that *Centerpoint* has no bearing on the issue before me as *Centerpoint* involved only a "narrow question of statutory interpretation." *Centerpoint*, 268 F.3d at 206. Specifically, the *Centerpoint* court was concerned with the issue of when an obligation "arises" for purposes of § 365(d)(3). Debtor contends that *Centerpoint* did not address the payment status of an obligation arising under § 365(d)(3), but rather merely recognized a debtor's obligation under the specific lease at issue.

**2.** The relevant legislative history indicates that § 365(d)(3) was enacted in order to protect landlords by requiring timely payment of lease obligations in the pre-rejection period. As stated by Senator Orrin Hatch, § 365(d)(3):

would lessen [the problem of a landlord providing current services without current payment] by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at

the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, *and other charges* on time pending the trustee's assumption or rejection of the lease.

*Centerpoint*, 268 F.3d at 210–11, *citing* H.R.Rep. No. 882, 95th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 576 (emphasis added).

I disagree with Debtor's contention that *Centerpoint* has no bearing on the issue before me. The salient facts of *Centerpoint* are akin to those here: the date a property tax bill for which the debtor was liable came due was during the pre-rejection period and the debtor sought to pay only a prorated portion of the tax bill. Like the Lease here, the *Centerpoint* lease obligated the debtor-tenant to pay the tax bill upon receipt. The question for the *Centerpoint* court was whether the tax liability was an obligation arising in its entirety from the lease in the pre-rejection period. The court concluded it was. Faced with the same question on similar facts, I am bound by *Centerpoint* to also conclude that Debtor's tax liability arose in full in the pre-rejection period and cannot be prorated.

Debtor further argues that Congress did not intend for § 365(d)(3) to create an administrative remedy as § 507 provides a priority for administrative claims, which are governed by § 503(b), yet neither section explicitly grants § 365(d)(3) claims either administrative status or a priority of any kind. Thus, Debtor argues that had Congress intended to grant § 365(d)(3) claims administrative or other priority status, it would have so indicated. Its failure to do, according to Debtor, indicates that Congress intended only for lessors to be paid in a timely manner. The Debtor also claims that granting administrative status to § 365(d)(3) claims fails to further the purpose of § 365(d)(3) as, while it insures the lessor will be paid, it does not insure that payment will be made in a timely fashion as many administrative claims are often not paid until plan confirmation.

I, however, agree with the Ninth Circuit that "section 365(d)(3) authorizes administrative status for the unpaid rent for the [pre-rejection] period. The granting of administrative priority for this peri-od is consistent with the intent of section 365(d)(3) and necessary to carry out its objectives." *In re Pacific–Atlantic Trading*, 27 F.3d at 405. Here, as in *Pacific–Atlantic Trading*, "the trustee defaulted in making the payments required by § 365(d)(3), which, in effect, would have operated as an administrative priority." *Id.* Adopting Debtor's interpretation of the statute, that administrative status is not granted to § 365(d)(3) claims, would permit debtors to benefit from disobeying the specific mandate of the statute. *See id.* As stated by the Ninth Circuit, that is an "untenable interpretation." *Id.* I will therefore grant MIT's claim for payment of the real estate taxes administrative status.

Aside from the administrative expense reasoning of the above cited decision that I adopt here, it seems to me that there is an additional basis for requiring Debtor to pay the full tax obligation at issue here. Section 503(b) defines a series of administrative expenses. Prior to the adoption of § 365(d)(3), § 503(b)(1) is the statutory provision which lessors relied upon to obtain recovery for pre-rejection period lease obligations. When § 365(d)(3) was adopted numerous courts concluded that the section effectively did away with the "benefit to the estate" test of § 503(b)(1). *See, e.g., Norritech v. Geonex Corp. (In re Geonex Corp.)*, 204 B.R. 684 (D.Md.), *aff'd*, 120 F.3d 261 (4th Cir.1997); *Thinking Machines Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machines Corp.)*, 67 F.3d 1021 (1st Cir.1995); *In re Pacific–Atlantic Trading Co.*, 27 F.3d 401 (9th Cir.1994); *In re Pudgie's Dev. of NY, Inc.*, 239 B.R. 688 (S.D.N.Y.1999); *In re F.A. Potts & Co., Inc.*, 137 B.R. 13 (E.D.Pa.1992); *In re Trak Auto Corp.*, 277 B.R. 655, 665 (Bankr.E.D.Va.2002). However, § 365(d)(3) does not say that in so many words. Indeed, it makes a broader state-

ment than that. It calls for the pre-rejection period timely performance of lease obligations "notwithstanding section 503(b)(1)". In other words, § 365(d)(3) effectively reads: "forget what § 503(b)(1) says" when the issue is pre-rejection period obligations of a nonresidential real estate lease. Consequently, § 365(d)(3) can be read to say that aside from administrative expenses provided for in § 503(b)(1), § 365(d)(3) creates a new and different kind of "obligation"—one that does not necessarily rest on the administrative expense concept. Thus, I do not have to conclude that the obligation is an administrative expense claim. I simply conclude that Congress found it appropriate to require that the lease "obligations" must be timely paid (i.e., when due in the pre-rejection period), however one may otherwise label those "obligations." Additionally, I note that in the second sentence of § 365(d)(3) (relating to the 60 day grace period for cause) the statute speaks in terms of "performance" of any such obligation, not payment of an administrative expense claim. Absent the grace period relief, the clear intent of the statute is that lessors get paid when the obligations accrue.[3] Finally, I note that § 503(a) provides that "[a]n entity may timely file a request for payment of an administrative expense." There is no suggestion of any such filing requirement in § 365(d)(3). Indeed, just the opposite is suggested. The timely payment of the obligation is dictated by the statute.

■ "[T]he language of § 365(d)(3) requires an estate representative to make immediate payment of nonresidential lease obligations where the estate representative can meet those obligations consistent with its obligations to others." *In re J.T. Rapps, Inc.*, 225 B.R. 257, 262–63 (Bankr. D.Mass.1998). It is when the estate is administratively insolvent and the trustee fails to comply with § 365(d)(3) that "an *automatic* grant of superpriority status is more problematic." *Id.* at 263 (emphasis in original).

Debtor relies on *J.T. Rapps* in support of its assertion that MIT's claim should not be paid immediately on the grounds that *J.T. Rapps* ultimately concluded that immediate payment was not appropriate based on the facts of that case. That case, however, involved an estate that was administratively insolvent and had been converted from a Chapter 11 case to one under Chapter 7 and was thus governed by Chapter 7's different priority scheme. More importantly, *J.T. Rapps* did not hold that an administrative claim under § 365(d)(3) cannot be paid immediately. Rather, it simply held that immediate payment was not automatic, but instead was to be determined by the administrative solvency of the estate. There has been no showing in the case before me that the estate is administratively insolvent. Therefore, I see no reason why MIT, saddled with a tax burden that by the terms of the Lease and pursuant to § 365(d)(3) is to be borne by Debtor, should be put in a worse position than other post-petition creditors who are paid during a Chapter 11 case in the ordinary course of business.

## CONCLUSION

For the foregoing reasons, MIT's motion for allowance and immediate payment of real estate taxes pursuant to 11 U.S.C.

---

**3.** Under appropriate circumstances a lessor may waive its right to immediate performance of the lease obligations. Such may be the case, for example, where lessor believes that a debtor is experiencing a temporary liquidity problem, or, where a lessor believes that the prospects of a later assumption and assignment, with the consequent cure, is in its best interest.

§ 365(d)(3) as a lease obligation arising during the pre-rejection period will be granted [4]

**4.** Debtor points out that in this case in connection with another matter I ruled that a lessor's remedy for a debtor's failure to timely satisfy its § 365(d)(3) obligations is to require the debtor to forthwith assume or reject the lease. On past occasions I have made similar observations from the bench in other cases. My ruling today results in a lessor's remedy not being limited to requiring assumption or rejection.