**In re MACOMB OCCUPATIONAL HEALTH CARE, LLC,**
Debtor.

No. 99–50374–G.

United States Bankruptcy Court,
E.D. Michigan.

July 29, 2003.

Keith Ostrowski, Kevin M. Ball, Catherine L. Nelson, Charles J. Taunt & Associates, PLLC, Birmingham, MI, for Carini Land Ventures.

Gene R. Kohut, Jill M. Gies, Southfield, MI, for trustee.

### OPINION RE: CARINI LAND VENTURES' MOTION TO RECONSIDER MAY 14, 2001 ORDER

JEFFREY R. HUGHES, Bankruptcy Judge.

Carini Land Ventures ("Carini") filed a motion to reconsider this court's order denying its claim against the bankruptcy estate for administrative rents and related costs associated with the bankruptcy estate's occupancy of non-residential real property both before and after the estate's deemed rejection of the unexpired lease agreement between Carini and Macomb Occupational Health Care, LLC ("Debtor"). For the reasons stated in this opinion, the motion is granted.

### I. FACTUAL BACKGROUND

Debtor examined and treated persons who had workplace-related injuries. It operated from three leased facilities. One of the facilities was located at 33800 Groesbeck Highway, Clinton Township, Michigan (the "Clinton Township facility"). Carini owned the Clinton Township facility. Carini had leased the Clinton Township facility to Debtor pursuant to a lease agreement dated July 25, 1998 (the "Carini lease agreement"). The lease provided Debtor with 7,800 square feet of office-type space for a five year term. Rent was $8,125.00 per month.

Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code on June 28, 1999. The bankruptcy case was subsequently converted to a Chapter 7 proceeding on March 16, 2000.

The property subject to the Carini lease agreement falls within that type of property described as "non-residential real property" in the Bankruptcy Code. *See, e.g.,* 11 U.S.C. §§ 365(c)(3), (d)(3), and (d)(4). Debtor did not assume or reject the Carini lease agreement during the 60–day interval immediately following the June 28, 1999 order for relief. Therefore, the Carini lease agreement was deemed rejected when this 60–day period lapsed. 11 U.S.C. § 365(d)(4).

Debtor ceased operations at the Clinton Township facility sometime during this 60–day interval.[1] However, Debtor did not

---

1. The Chapter 7 trustee argued at the March 15, 2001 hearing that Debtor had "effectively

remove all of its property from the premises. According to Carini, Debtor left refrigerators, televisions, VCRs, x-ray equipment, whirlpool tanks, exercise equipment, massage tables, blood pressure machines, computer hardware, office equipment, and furniture. Carini claims that what Debtor left was enough to fill two moving trucks. While Carini claims that this property was worth a significant amount, the Chapter 7 trustee argues that it had little value.

Carini asserts that it spoke with one of Debtor's principals immediately after it received notice of Debtor's Chapter 11 filing. It alleges that Debtor requested Carini to:

> [r]efrain from seeking the court's involvement to terminate the existing lease in order to permit [Debtor] additional time to reorganize under the bankruptcy case. Mr. Pfahlert [Debtor's principal] informed [Carini] that it was [Debtor's] intentions [sic] to assume or permit the assignment of the Lease Agreement at a future date.[2]

Carini does not indicate whether this conversation occurred before or after the deemed rejection of the Carini lease agreement on August 27, 1999.

Carini asserts that it spoke to Debtor's principal a second time several months later. Debtor's continued failure to pay post-petition rents supposedly prompted this second conversation. Carini claims that it threatened to repossess the Clinton Township facilities during this conversation but that Debtor persuaded it to wait yet again by promising to cure the arrearage.[3]

Carini does not contend that it had any conversation with the Chapter 7 trustee about the Clinton Township facility after Debtor's case converted to a Chapter 7 proceeding. However, Carini does assert that individuals who had been associated with Debtor approached it subsequent to the conversion with a proposal to "assume" the lease agreement as part of an overall plan to acquire Debtor's business from the Chapter 7 trustee and to resume operations at the Clinton Township facility.

The Chapter 7 trustee asserts that Debtor voluntarily surrendered the Clinton Township facility shortly after the Chapter 11 proceeding began. He claims that Carini made no effort during the Chapter 11 proceeding either to collect rent for Debtor's supposed continued possession of the premises or to remove Debtor's property from the premises. Moreover, the Chapter 7 trustee claims that Carini changed the locks either during the Chapter 11 proceeding or immediately after the case was converted.

Although Debtor ceased operations at the Clinton Township facility, Debtor continued to operate at its other two facilities for the duration of the Chapter 11 proceeding. The Chapter 7 trustee also operated Debtor's business at these two locations in order to preserve their "going concern" value. He quickly completed a sale of all of Debtor's assets to Concentra Health Services ("Concentra"). Concentra negotiated new leases with the landlords of the two facilities at which Debtor had continued to operate during the Chapter 11 proceeding. However, Concentra elected

---

abandoned" the Clinton Township facility sometime prior to the commencement of its Chapter 11 proceeding. However, the Chapter 7 trustee's brief filed shortly before the hearing contradicts this position. It states that Debtor ceased operating its business at the Clinton Township facility "shortly after Debtor filed its petition for relief." Chapter 7 trustee's February 26, 2001 Brief, p. 1.

2. Affidavit of Pasquale Scamardella, ¶ 5.

3. Affidavit of Pasquale Scamardella, ¶ 6.

not to resume operations at the Clinton Township facility.

The Chapter 7 trustee claims that he did not become aware of the equipment and furniture that remained at the Clinton Township facility until shortly before Concentra purchased Debtor's business. The Chapter 7 trustee agreed with Concentra that whatever was left was included in what Concentra had purchased. Accordingly, he allowed Concentra to remove all of the remaining equipment and furniture from the Clinton Township facility on May 16, 2000, two months after Debtor had converted to a Chapter 7 proceeding.

## II. PROCEDURAL BACKGROUND

The parties agree that neither Debtor nor the Chapter 7 trustee paid anything to Carini for the bankruptcy estate's occupancy of the Clinton Township facility for the interval between the filing of Debtor's petition and Concentra's removal of the equipment and furniture. Carini did make a demand upon the Chapter 7 trustee to pay it rent for this 11–month period shortly after the equipment and furniture was removed. However, Carini did not file a written request with the court for payment of its administrative rent claim until January 8, 2001. The request it filed was for $103,726.50.

Carini asserts that it is entitled to actual contract rent of $16,250 (2 months × $8,125) for the 60–day interval between Debtor's Chapter 11 petition and Debtor's deemed rejection of the Carini lease agreement on August 27, 1999. Carini asserts that it is also entitled to administrative rent for the remaining seven months of the Chapter 11 proceeding and the two months

of the Chapter 7 proceeding because of the estate's continued use of the Clinton Township facility to store Debtor's equipment and furniture. Carini concedes that it is entitled to only the reasonable rental value of the premises for this interval but argues that value is equal to the rate which Debtor and it had set in the Carini lease agreement. Carini's total administrative rent claim for these nine months is $73,125 (9 months × $8,125). Carini does not divide this portion of its claim into Chapter 11 and Chapter 7 components. It appears that the allocation should be approximately $56,875 (7 months × $8,125) as Debtor's remaining Chapter 11 administrative claim and approximately $16,250 (2 months × $8,125) as Debtor's Chapter 7 administrative claim.[4]

Carini asserts that it is also entitled to late fees in the amount of $812.50 for the two months of rent Debtor did not pay prior to the deemed rejection of the Carini lease agreement. Carini relies upon paragraph 43 of the Carini lease agreement as the basis for this element of its claim. Although not designated, it would appear that this amount is claimed by Carini as a Chapter 11 administrative expense.

Finally, Carini asserts that it is entitled to attorney fees of $13,539 in connection with the collection of the rents due on account of the Clinton Township facility. Carini relies upon paragraph 48(b) of the Carini lease agreement as the basis for this element of its claim. It appears from the record that most, if not all, of these fees were incurred by Carini after Debtor had converted to a Chapter 7 proceeding. Carini does not indicate whether it claims

---

**4.** In instances where the Chapter 7 proceeding was previously administered as a Chapter 11 proceeding and where there remain unpaid Chapter 11 administrative expenses, the unpaid Chapter 11 administrative expenses retain their administrative priority over other priority claims but are subordinate to administrative expenses incurred in conjunction with the Chapter 7 proceeding. 11 U.S.C. § 726(b).

this amount as a Chapter 11 or a Chapter 7 administrative expense.

The Chapter 7 trustee contests the allowance of each element of Carini's administrative claim. He claims that Carini is at most entitled to only the reasonable rental value associated with the benefit actually realized from the estate's post-petition storage of Debtor's equipment and furniture at the Clinton Township facility. He further contends that Carini is barred from recovering even the storage fees associated with the equipment and furniture (1) because Carini was dilatory in its demand to recover such fees; (2) because Carini had actually dispossessed the estate of the Clinton Township facility at some point during the bankruptcy proceeding by changing the locks; and (3) because Carini had conspired with Debtor's former owners during the Chapter 7 proceeding to wrongfully withhold Debtor's equipment and furniture from its rightful buyer, Concentra Health Services. Carini denies all of the Chapter 7 trustee's allegations.

Carini's January 18, 2001 request for payment of its administrative claim was supported by two briefs, an affidavit, and various exhibits attached to the briefs. On February 26, 2001, the Chapter 7 trustee filed his objection to the request. His objection was supported by an affidavit and a brief.

Bankruptcy Judge Ray Reynolds Graves heard the matter on March 15, 2001. Both parties presented argument concerning their respective positions. However, no evidence was introduced. At the conclusion of the arguments, Judge Graves denied Carini's request for payment. He gave no reason for denying the request other than that Carini had not met its burden of proof:

> The petitioning party has not met the burden for proving that they're entitled to Administrative Expense claim, at best, a ground for unsecured claim. A motion for payment on Administrative Expense claim is denied.

Tr., 3/15/01 Hearing, p. 21.

On May 14, 2001, the order denying Carini's request was entered. The order did not elaborate upon the court's decision. It simply referred to the reasons given at the March 15, 2001 hearing.

On May 23, 2001, Carini filed a timely motion to reconsider the matters denied by the May 14, 2001 order. The motion was brought pursuant to Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure. The Chapter 7 trustee has not been given leave to respond nor has there been a hearing concerning Carini's motion.[5]

### III. DISCUSSION

#### A. Grounds Exist to Modify the May 14, 2001 Order.

Fed. R. Bankr.P. 9023 and Fed. R. Bankr.P. 9024 incorporate by reference Rules 59 and 60 of the Federal Rules of Civil Procedure.[6] Rule 59(e) motions to

---

**5.** In the interval between the March 5, 2001 hearing and the May 23, 2001 motion to reconsider, the Sixth Circuit elected not to reappoint Judge Graves. I was appointed as one of several visiting judges to hear cases which had been assigned to Judge Graves and I specifically assumed the responsibility for Judge Graves' Chapter 7 cases, including Macomb Occupational Health Care, LLC.

The Sixth Circuit has now appointed Hon. Thomas J. Tucker as Judge Graves' successor.

Carini's motion for rehearing is one of the last matters assigned to me which I must complete as a visiting judge for this court.

**6.** While Fed. R. Bankr.P. 9023 adopts Fed. R.Civ.P. 59 verbatim, Fed. R. Bankr.P. 9024 does make some modifications to Fed.R.Civ.P. 60. However, these modifications are not relevant to consideration of Carini's motion for rehearing.

alter or amend judgments or Rule 60(b) motions for relief from judgment should be considered skeptically. Parties are entitled to rely upon the finality of an order once it is entered. Giving finality to an order also promotes judicial economy and efficiency. *See, Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund,* 249 F.3d 519, 528 (6th Cir.2001), *Waifersong, Ltd. Inc. v. Classic Music Vending,* 976 F.2d 290, 292 (6th Cir.1992). Indeed, this court's own local rule requires that a party must demonstrate not only "a palpable defect by which the Court and the parties have been misled" but also that "a different disposition of the case must result from a correction thereof" in order to secure relief from a previously entered order. LBR 9024–1(c) (E.D.Mich.).

However, LBR 9024–1(c) also reserves for the court the ability to exercise its discretion in considering such motions. In this instance, I conclude that the record is not sufficient to support Judge Graves' decision to categorically deny Carini's entire claim for administrative rent. For example, Judge Graves denied Carini's claim for rent for the two-month interval between the date Debtor filed its Chapter 11 petition and the date Debtor's lease was deemed rejected because Carini supposedly had not met its burden. However, the Chapter 7 trustee did not challenge Carini's right to receive administrative rent for this period. He conceded that Carini was entitled to whatever would be a reasonable rent for the estate's use of the Clinton Township facility as a site to store the equipment and furniture Debtor had left there. What the Chapter 7 trustee had argued was that Carini had forfeited its right to receive administrative rent for this two-month interval because of Carini's own post-petition activities (*e.g.,* Carini's alleged conspiracy with Debtor's former owners to withhold assets sold to Concentra). In effect, the Chapter 7 trustee's argument was that Carini had "unclean hands", which is an affirmative defense. *Pierce v. Apple Valley, Inc.,* 597 F.Supp. 1480, 1485 (S.D.Ohio 1984). The Chapter 7 trustee, not Carini, had the burden of establishing this defense. Moreover, the record is devoid of any proof which would support the Chapter 7 trustee's contention.

Therefore, Carini's motion is granted. The task which remains for me is to determine what, if any, portion of Carini's claim can be adjudicated based upon the existing record and what portion of Carini's claim will require testimony and other evidentiary offerings before it can be properly ascertained.

### B. *Consideration of Carini's Administrative Claim.*

1. *Carini's Claim For Administrative Rent from June 28, 1999 to August 27, 1999 (the "Pre–Rejection Chapter 11 Administrative Rent Claim").*

 I have already written concerning a landlord's administrative claim for rents on account of an unexpired lease prior to its ultimate rejection by the estate. *In re Palace Quality Services Industries, Inc.,* 283 B.R. 868 (Bankr.E.D.Mich.2002). For the same reasons I gave in *Palace Quality Services,* I conclude that Carini is entitled to an administrative rent claim for rents which came due on the unexpired Carini lease agreement during the two-month interval between Debtor's bankruptcy petition and the deemed rejection of the Carini lease agreement. *Id.* at 873–878. However, the basis for allowing this portion of Carini's claim is not, as Carini contends, Section 365(d)(3).[7] Unlike the majority of

---

7. Hereinafter, textual citations to "Section _____" shall mean the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

courts, I do not interpret Section 365(d)(3) as creating some type of quasi-administrative claim that stands apart from administrative claims allowed under Section 503. *Id.*

However, I do interpret Section 503(b)(1)(A) itself as requiring the estate to pay Carini the actual rent which Debtor was obligated to pay Carini under the lease agreement during the post-petition interval before its deemed rejection on August 27, 1999. Section 503(b)(1)(A) defines an administrative expense as including "the actual, necessary costs and expenses of preserving the estate." When Debtor filed its petition, the bankruptcy estate acquired Debtor's unexpired leasehold interest in the Clinton Township facility. The bankruptcy estate also acquired a grace period of at least 60 days to decide whether to continue in possession of the Clinton Township facility under the terms of the Carini lease agreement (*i.e.*, assume the Carini lease agreement) or to abandon those possessory rights (*i.e.*, reject the Carini lease agreement). 11 U.S.C. § 365(d)(4). However, the grace period provided by Section 365(d)(4) came at a price. Paragraph 3 of the Carini lease agreement required that $8,125 be paid for rent in advance on July 1, 1999 and again on August 1, 1999. The bankruptcy estate had no more right to possess the Clinton Township facility under the Carini lease agreement than did Debtor itself. The bankruptcy estate had to pay the July and August rents in order to preserve its possessory rights under the Carini lease agreement until it made its decision to assume or reject that agreement. Consequently, the rents which were due in July and August are entitled to administrative priority pursuant to Section 503(b)(1)(A). *Id.*

■ The Carini lease agreement also required Debtor to pay a late fee equal to 5% of the monthly rent if the rent payment was more than five days overdue. Consequently, the bankruptcy estate's failure to pay the rent due on July 1, 1999 and the rent due on August 1, 1999 resulted in the accrual of two late fees of $406.25 each during the post-petition interval before the lease's deemed rejection on August 27, 1999. Carini may add these two late fees to its pre-rejection Chapter 11 administrative rent claim for the same reason that it is entitled to an administrative claim for the actual rent due for this interval: the bankruptcy estate was obligated to pay these amounts as a condition to preserving the leasehold interest it had acquired from Debtor in the Clinton Township facility pending its ultimate decision to assume or reject the unexpired lease agreement between Debtor and Carini. *Id.* at 877.

■ To summarize, the record is sufficient to support Carini's Chapter 11 administrative claim for the July and August 1999 rents due under the Carini lease agreement and the late fees associated with those rents. This amount totals $17,062.50. However, allowance of Carini's claim for pre-rejection Chapter 11 administrative rent and related charges in this amount remains subject to the defenses raised by the Chapter 7 trustee. Again, these defenses are that Carini is barred from recovering any amount otherwise allowed as an administrative claim because: (1) Carini was dilatory in its demand to recover its claim; (2) Carini had actually dispossessed the estate of the Clinton Township facility by allegedly changing the locks; and (3) Carini had conspired with Debtor's former owners during the Chapter 7 proceeding to wrongfully withhold Debtor's equipment and furniture from Concentra. Judge Graves did not take proofs at the March 15, 2001 hearing with respect to any of these defenses because he denied Carini's administrative

claim on its own merits. Consequently, an evidentiary hearing will be required before the Chapter 7 trustee's defenses can be adjudicated.

2. *Carini's Claim For Administrative Rent From August 28, 1999 To March 16, 2000 (the "Post–Rejection Chapter 11 Administrative Rent Claim").*

It does not appear from the record that Debtor, as debtor-in-possession, surrendered the Clinton Township facility to Carini as required by Section 365(d)(4) upon Debtor's deemed rejection of the Carini lease agreement on August 27, 1999.[8] Rather, it appears that Debtor continued to store at the Clinton Township facility equipment and furniture which Debtor had used at that location for the operation of its business. Notwithstanding Trustee's claims to the contrary, the record supports the conclusion that the equipment and furniture had value to the estate. Trustee concedes that Concentra, the entity to whom Trustee had sold Debtor's assets, had sufficient interest in this equipment and furniture to appear at the Clinton Township facility on two separate occasions to take possession of this property. It is unlikely that Concentra would have made this effort if the equipment and furniture ultimately recovered had, as the Chapter 7 trustee contends, no value.

Carini asserts that the bankruptcy estate's continued possession of the Clinton Township facility alone is sufficient to justify its claim for post-rejection administrative rent.[9] It is often said that "possession is 9/10ths of the law." However, it is actually more accurate to say that "possession is **ONLY** 9/10ths of the law." While possession is certainly an important consideration in determining what a particular party's rights may be with respect to an item of property, bare possession alone is seldom sufficient to create a substantive legal right. There must always be at least another "1/10th" before the law recognizes a right. Consequently, unless Carini can also establish some basis under either state or federal law to support its claim for administrative rent during this post-rejection interval, the bankruptcy estate's continued possession of the Clinton Township facility is simply irrelevant.

I begin my analysis by asking whether Carini would have had a right to recover administrative rent from the bankruptcy estate had there not been a landlord/tenant relationship between Debtor and Carini concerning the Clinton Township facility prior to the commencement of Debtor's bankruptcy proceeding. For example, assume that Debtor's equipment and furniture had been located somewhere else when Debtor filed its bankruptcy petition. For purposes of simplicity, assume further that Debtor had filed for relief under Chapter 7 as opposed to Chapter 11. Fi-

---

**8.** Section 365(d)(4) states:
Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, **and the trustee shall immediately surrender such nonresidential real property to the lessor.**
11 U.S.C. § 365(d)(4) (emphasis added).

**9.** The bankruptcy estate's alleged hold-over of the premises during the Chapter 11 proceeding would have been from August 28, 1999 to March 16, 2000, the date Debtor's Chapter 11 proceeding converted to a Chapter 7 proceeding, an interval of approximately six and one-half months. It is unclear as to exactly what amount Carini claims as administrative rent for this time period. It could be $48,750 (6 months × $8,125), $56,875 (7 months × $8,125), or some amount in between these two figures.

nally, assume that, for whatever reason, the Chapter 7 trustee wanted to relocate the equipment and furniture to the Clinton Township facility and store it there.

If the Chapter 7 trustee were to approach Carini to store the equipment and furniture under these circumstances, there is no question of what the outcome would be. The Chapter 7 trustee, as the representative of the bankruptcy estate, would have to negotiate an agreement with Carini to store the estate's property at the Clinton Township facility. If an agreement were reached and if that agreement were approved by the bankruptcy court after notice and a hearing as a necessary cost of preserving the estate, 11 U.S.C. § 503(b)(1)(A), then the rent agreed upon by Carini and the Chapter 7 trustee would be the amount to which Carini would be entitled as an administrative claim for the estate's storage of the equipment and furniture at the Clinton Township facility. Conversely, if an agreement could not be reached, then the Chapter 7 trustee would have to look elsewhere. Nothing in the Bankruptcy Code would permit the Chapter 7 trustee to compel Carini's acquiescence to a storage arrangement. Indeed, if the Chapter 7 trustee were to place the furniture and equipment at the Clinton Township facility without first reaching an agreement with Carini, the bankruptcy estate would be trespassing and Carini could compel the Chapter 7 trustee to immediately remove the property.

This first hypothetical illustrates a fundamental principle of landlord/tenant law: all landlord/tenant relationships are consensual.

> It is generally held that, in order that the relation of landlord and tenant may exist, there must be present all the necessary elements of the relation, which include permission or consent on the part of the landlord to occupancy by the tenant, subordination of the landlord's title and rights on the part of the tenant, a reversion in the landlord, the creation of an estate in the tenant, the transfer of possession and control of the premises to him, and, **generally speaking, a contract, either express or implied, between the parties.**

*Grant v. Detroit Assn. of Women's Clubs,* 443 Mich. 596, 505 N.W.2d 254, at n. 6 (1993) (quoting from 51C C.J.S., Landlord and Tenant, § 1, p. 32) (emphasis added).

It is the consensual nature of the landlord/tenant relationship which provides the legal basis for the owner to demand rent from the occupant for its possession.

The term **"rent"** is defined in 32 Am. Jur., Landlord and Tenant, § 428, p. 347 as follows:

> The word "rent" derives from the Latin word "reditus." In ordinary use, it means the return made by one who occupies real estate **under an express or implied contract with the owner,** for the occupation of the premises, and is defined broadly as the compensation in money, provisions, chattels, or services, paid or given in exchange for the use and occupancy of real estate. . . .

*Id.* at 603, 505 N.W.2d 254 (emphasis added).

An express agreement to pay a specified amount as rent is not necessary in order for an owner of land to recover rent from a person who is occupying it. An agreement to pay rent can be implied from a more general understanding between the parties. However, there must be at least some understanding between the parties that the occupant's relationship with the owner concerning his or her possession of the property is to be that of a tenant to a landlord.

It has been uniformly held in this state that an action for use and occupation will not lie except where a contract relation exists of landlord and tenant, by virtue of which an obligation exists to pay rent.

*Lockwood v. Thunder Bay River Boom Co.,* 42 Mich. 536, 538–39, 4 N.W. 292 (1880) (citations omitted).

Without such an understanding, the owner has no right to expect payment of rent from the occupant. For example, an owner of land is precluded from recovering rent from a trespasser for the simple reason that no landlord/tenant relationship can be inferred from the trespasser's unlawful occupancy of the property. *Smith v. Haight,* 188 Mich. 512, 518, 154 N.W. 563 (1915).

There is no question that Carini had the right under Michigan law to recover rent from Debtor prior to the commencement of its bankruptcy proceeding. The Carini lease agreement not only established the requisite landlord/tenant relationship between Carini and Debtor but also set out quite clearly the amount of rent which Debtor was obligated to pay Carini in order to maintain that relationship.

There is also no question that Carini continued to have a right under Michigan law to recover rent from the bankruptcy estate immediately following Debtor's petition for relief. The leasehold interest created by the Carini lease agreement did not terminate; rather, it transferred to the bankruptcy estate pursuant to Section 541(a). *In re Palace Quality Services,* 283 B.R. at 880. Consequently, the landlord/tenant relationship which justified Carini's right to recover rent from Debtor pre-petition also served as the legal basis for Carini's right to recover rent from the bankruptcy estate immediately after Debtor filed its petition.

However, on August 27, 1999, the Carini lease agreement was deemed rejected by operation of Section 365(d)(4). The question is what impact, if any, did the rejection of the Carini lease agreement have upon the landlord/tenant relationship which had been created by that agreement. If rejection of the agreement adversely affected this relationship, then the legal basis upon which Carini had relied up to that point to recover post-petition rent from the bankruptcy estate would no longer exist. Carini would consequently have to find some other basis for establishing the bankruptcy estate's obligation to pay it rent for the estate's post-rejection occupancy of the Clinton Township facility.

My second hypothetical is to assume again that this case is a Chapter 7 proceeding. However, in this hypothetical, assume that Debtor had an unexpired lease with Carini for the Clinton Township facility but that the premises are empty when Debtor files its bankruptcy petition. Consequently, the only asset of the bankruptcy estate related to the Clinton Township facility is the Debtor's leasehold interest in the unexpired lease itself. If the Chapter 7 trustee did nothing, the unexpired lease agreement would be deemed rejected on the 60th day after the commencement of Debtor's Chapter 7 proceeding and the Chapter 7 trustee would be required to immediately surrender the premises to Carini. 11 U.S.C. § 365(d)(4). *See also, Palace Quality Services,* 283 B.R. at 886; *Miller v. Chateau Communities, Inc. (In re Miller),* 282 F.3d 874, 876–77 (6th Cir.2002). Ideally, the Chapter 7 trustee would appear at Carini's doorstep within a few days of the lease's deemed rejection and turn over to Carini the keys to the Clinton Township facility. Nothing more would be required because, under this hypothetical, the Clinton Township facility is empty.

However, post-rejection surrenders of leased commercial property are seldom so prompt. Suppose, therefore, that the Chapter 7 trustee, for whatever reason, refuses to comply with Section 365(d)(4), thereby compelling Carini to secure either an eviction order from the bankruptcy court itself pursuant to Section 365(d)(4) or relief from the automatic stay so that it can get an eviction order from a state court. Or, suppose that the Chapter 7 trustee simply forgets to formally surrender the Clinton Township facility and Carini makes no effort to compel its surrender. Would Carini be entitled to administrative rent for the interval between the deemed rejection of the lease agreement and Carini's ultimate repossession of the Clinton Township facility?

The visceral response to this question is yes. Intuition certainly suggests that the bankruptcy estate should pay rent for whatever time the estate remained in possession after the lease agreement was rejected. This result seems even more compelling if the bankruptcy estate's continued possession is in contravention of the trustee's duty under Section 364(d)(4) to immediately surrender the premises. That the landlord is entitled to rent for this post-rejection interval at the agreed upon rate under the rejected lease agreement is certainly the conclusion reached by the court in *In re Longua*, 58 B.R. 503 (Bankr. W.D.Wis.1986), the case upon which Carini primarily relies in making its claim for post-rejection administrative rent.

■ In *Palace Quality Services*, I discussed what I have characterized as the "neutral transfer" principle. This principle recognizes that the bankruptcy estate's interest in property acquired from the debtor at the outset of the case can be no greater or no less than what the debtor had to transfer to the estate. *In re Palace Quality Services*, 283 B.R. at 880–81. If this principle applied without qualification, it would indeed stand to reason that the bankruptcy estate, as assignee of the pre-petition leasehold interest, should be liable for the actual rent which accrued post-rejection under the lease agreement until possession was ultimately surrendered. Indeed, this would be the result if the bankruptcy had not been filed and the trustee were simply an assignee of the debtor's leasehold interest under state law.[10]

■ However, the neutral transfer principle applies only to the extent the Bankruptcy Code itself does not alter the outcome required by the application of non-bankruptcy law. *Id.* at 880. As the Supreme Court observed in *United States v. Craft*, 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002), state law has an important role in interpreting federal law which may affect a particular property interest. However, the answer ultimately is determined by reference to federal law, not state law. *Id.* at 1420. Consequently, what may appear to be the proper result in a bankruptcy proceeding if only non-bankruptcy principles of law were to apply will in fact not be the correct result if the Bankruptcy Code itself alters those principles.[11]

---

**10.** Under Michigan law, the tenant would be liable not only for all rent due under the lease agreement up to the tenant's surrender of possession but also for all future rent due for the remaining term of the lease. *In re Palace Quality Services*, 283 B.R. at 885. The tenant's liability for these future rents would be tempered only by the landlord's own duty to mitigate. *Id.*

**11.** The distorting effect of the Bankruptcy Code upon outcomes which would otherwise be expected outside the context of bankruptcy at times gives bankruptcy law the aura of an "Alice through the Looking Glass" world.

Returning now to my second hypothetical, if only non-bankruptcy law applied, then the neutral transfer principle would dictate that Carini be allowed an administrative rent claim not only for the interval between Debtor's petition and the rejection date but also for the interval between the rejection date and the date the bankruptcy estate actually surrendered the premises. However, in this instance, the Bankruptcy Code intervenes to alter this logic. Specifically, Section 365(g)(1) [12] and Section 502(g) [13] modify the non-bankruptcy result by causing all damages arising from the bankruptcy estate's rejection of an unexpired lease acquired from the debtor, including any claim for rent under the lease resulting from the estate's continued occupancy of the premises subsequent to the rejection of the underlying lease agreement, to be treated as having arisen prior to the commencement of the bankruptcy proceeding. Put simply, what would appear under non-bankruptcy law to be a valid claim by Carini for administrative rent for the estate's continued possession of the Clinton Township facility premises subsequent to rejection of the underlying lease agreement is in fact a pre-petition claim entitled to no priority whatsoever because of the intervention of the Bankruptcy Code itself.

Sections 365(g)(1) and 502(g) also preclude Carini from relying upon the rejected lease agreement as its legal justification for demanding administrative rent from the bankruptcy estate for the estate's post-rejection occupancy of the Clinton Township facility. The landlord/tenant relationship created by that agreement can justify only one recovery of rent. Sections 365(g)(1) and 502(g) require that Carini's pre-petition rejection claim include whatever future rent Carini was entitled to under the Carini lease agreement at the time it was rejected. These future rents, of course, would include all rents due under the Carini lease agreement for the

The temptation is to treat matters involving a bankruptcy as being governed by a set of rules which bears little resemblance to the rules which govern behavior and relationships when a bankruptcy is not involved. However, bankruptcy proceedings do not transpire in some exotic land which is exempt from the laws which govern the rest of the world. A bankruptcy estate is a legal entity. Like any other legally recognized entity, a bankruptcy estate is capable of owning and conveying property. A bankruptcy estate can enter into binding contracts. A bankruptcy estate can be liable for tortious conduct.

A bankruptcy estate does not engage in these activities in a vacuum. Rather, its activities are proscribed by the very same laws as those which regulate the activities of other legal entities which own property and which engage in business transactions. The only difference is that the outcome of activities which involve a bankruptcy estate may also be affected by the Bankruptcy Code itself. Consequently, it is incorrect to consider bankruptcy matters as being governed exclusively by the Bankruptcy Code and whatever "common law" the courts may have enacted in conjunction with that Code. Instead, the Bankruptcy Code should be treated as simply a filter which must be used when a bankruptcy petition is filed to re-assess an already existing framework of laws and regulations.

12. Section 365(g)(1) states:

[I]f such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or
11 U.S.C. § 365(g)(1).

13. Section 502(g) states:

A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.
11 U.S.C. § 502(g).

time period the bankruptcy estate remained in possession of the Clinton Township facility after rejection of the Carini lease agreement. Consequently, the Carini lease agreement cannot also support Carini's separate request to recover administrative rent from the bankruptcy estate for the very same time period.[14] Therefore, if Carini is to recover rent from the bankruptcy estate for its post-rejection occupancy of the premises as an administrative expense, Carini must find some basis for establishing the bankruptcy estate's obligation to pay such rent other than the rejected lease agreement itself.

One court has based its award of administrative rent for a bankruptcy estate's post-rejection occupancy of leased premises upon the theory that the bankruptcy estate became a "hold-over tenant." *In re Trak Auto Corp.*, 277 B.R. 655, 664 (Bankr.E.D.Va.2002). Other courts have also used "hold-over" and "holding over" in explaining their reasons for awarding such administrative claims. *In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415, 416 (D.Mass.1987); *In re Longua*, 58 B.R. 503, 506 (Bankr.W.D.Wis.1986). These courts' characterization of the post-rejection relationship between the bankruptcy estate and debtor's former landlord in this manner implies that the hold-over itself creates the legal basis for the landlord's recovery of post-rejection rent from the bankruptcy estate. However, there is no landlord/tenant relationship under Michigan law known as a "hold-over tenancy."

■ Michigan law recognizes three types of landlord/tenant relationships. A "tenancy at will" is a tenancy which has no definite term and which may be terminated at the discretion of either party.[15] In contrast, an "estate for years" is a tenancy which has a fixed, ascertainable term (either a year or some other period) which may not be unilaterally shortened by either party. However, both a tenancy at will and an estate for years share the common characteristic of being based upon an agreement between the parties, either express or implied, that the relationship between them is to be that of landlord and tenant. *See,* generally, John G. Cameron, Jr., *Michigan Real Property Law; Principles and Commentary,* pp. 867–700 (2d ed.1993).

A "tenancy by sufferance" is similar to a tenancy at will in that its term is also indefinite and either party may terminate the tenancy at its discretion. A tenancy by sufferance is distinguished from a tenancy at will by the fact that there is no landlord/tenant relationship between the parties. The occupant of the premises simply holds possession at the "sufferance" of the owner. The common characteristic of all tenancies by sufferance is that the occupant at some prior point in time had the right to possess the premises. The prior right to possession must have also arisen by agreement, not as a matter of law.[16] *Id.*

■ Under Michigan law, a tenant who does not surrender possession of the prem-

---

**14.** Carini would presumably prefer waiving whatever claim it had for pre-petition damages in favor of its claim for post-petition administrative rent to avoid the problem of a double recovery. Unfortunately, Section 365(g)(1) and 502(g) do not give Carini this option.

**15.** A tenancy at will may also be from month to month or from year to year.

**16.** If the occupant's original right to possession was based upon law as opposed to an agreement between the parties, or the occupant's possession was unlawful, then no tenancy by sufferance can be created by the hold-over. Rather, the hold-over occupant is a trespasser.

ises upon the expiration of the lease is deemed to continue in possession as a tenant by sufferance.

Defendant, holding over after the expiration of his lease, becomes a tenant by sufferance; that is, a tenant who came into possession rightfully, by permission of the owner, and continued to occupy the premises after the expiration of his lease. Coke on Littleton, 57b; 2 Blackstone, Comm. 150.

*Ryal's, Inc. v. Stavropoulos,* 273 Mich. 680, 681, 263 N.W. 770 (1935); *see also, School Dist. No. 11 of Alpine Twp. v. Batsche,* 106 Mich. 330, 334, 64 N.W. 196 (1895).

■ A tenancy by sufferance will also be created when a grantor of property remains in possession of property after delivery of the deed to the grantee, *Wilhelm v. Herron,* 211 Mich. 339, 343, 178 N.W. 769 (1920), and when the vendee of a land contract remains in possession after the vendee has defaulted under the land contract and has failed to cure the default within the time required to avoid forfeiture. *Durda v. Chembar Dev. Corp.,* 95 Mich.App. 706, 714, 291 N.W.2d 179 (1980). *See, generally,* Cameron, *supra,* p. 869.

What the court in *Trak Auto* identified as a hold-over tenancy by the bankruptcy estate was actually a tenancy by sufferance, at least under Michigan law. The bankruptcy estate, as successor to the debtor's leasehold interest created by an unexpired lease, has at the outset of the bankruptcy proceeding the legal right to possess the premises. However, that legal right terminates if the bankruptcy estate rejects the lease agreement. Moreover, the rejection of the lease permits the landlord to evict the bankruptcy estate from the premises. Consequently, if the bankruptcy estate continues to occupy the premises subsequent to its rejection of the unexpired lease, its continued possession

will be by the sufferance of the landlord alone.

■ As already discussed, the law in Michigan is that an owner of land may not recover rent from its occupant unless there is an agreement between the parties to treat their relationship as that of a landlord and tenant. Consequently, the law in Michigan is also that an owner of land subject to a tenancy by sufferance, which by definition is not based upon a landlord/tenant relationship, may not recover rent from an occupant holding possession pursuant to the tenancy. *Hogsett v. Ellis,* 17 Mich. 351 (1868). The courts have logically concluded that an owner has no one to blame but itself for allowing a tenant by sufferance to occupy its land rent-free. If the owner wanted relief, then it had only to "suffer" the occupant's possession no more by evicting the unwanted tenant.

■ However, a tenant by sufferance may eventually be compelled to pay rents for its continued possession of an owner's property. For example, if a tenant by sufferance were to later agree to a landlord/tenant relationship with the owner to stave off eviction, then the tenancy would by definition transform itself from one by sufferance to one at will and the owner would have again the attendant right to collect rents. *School Dist. No. 11 of Alpine Twp. v. Batsche,* 106 Mich. 330, 334, 64 N.W. 196 (1895). As with all tenancies at will, an agreement between the owner and the tenant by sufferance to create the requisite landlord/tenant relationship need not be explicit. The agreement may also be implied.

In the instance of a tenant holding over on an expired lease, the courts generally do find an implied tenancy at will if the hold-over tenant remains in possession for a sufficient time following the expiration of the lease without objection by the landlord. The assumption is that the maintenance of

the status quo manifests an intention by both parties to continue the landlord/tenant relationship which had previously existed under the expired lease, albeit the tenancy now would be a tenancy at will. The assumption that the landlord/tenant relationship is to continue is further buttressed if the tenant pays rent during the hold-over and the owner accepts the rent. *See, e.g., Faraci v. Fassulo*, 212 Mich. 216, 220, 180 N.W. 497 (1920); *Kokalis v. Whitehurst*, 334 Mich. 477, 480–81, 54 N.W.2d 628 (1952).[17]

■ However, even if the owner of the land does not acquiesce to the hold-over, and therefore the hold-over remains a tenancy by sufferance, the owner may still recover rent from the tenant if the owner makes an actual demand upon the occupant to return possession of the premises. The Michigan Supreme Court, in *Hogsett v. Ellis*, 17 Mich. 351 (1868), explained the reason for this exception.

> But, upon principle in the case put, of a tenant for years holding over after the expiration of his term, there may be some reasonable ground for saying that, until such notice or demand of possession, it is the landlord's own folly or negligence to suffer the tenant to remain; since, if he wanted the possession, he ought to demand it, or re-enter; and that, until he shall indicate to the tenant his wish to have the premises, the tenant may infer that he does not wish the possession, or that the tenant shall leave the premises vacant, nor intend to insist upon rent, or he would say so.

But after the rightful estate (as the tenancy for years) is terminated, and the landlord gives the tenant notice to quit, and demands the possession, this is as clear an indication of his desire to have the possession as an actual entry would be; and the tenant who has refused to give up the possession when thus demanded, can not justly be heard to complain that the landlord has been guilty of laches for not putting him out by force, or resorting to legal process to that end; nor to claim that for this laches he ought to be allowed the use of the property without compensation. It is little short of absurd to hold that, in such a case, the landlord has been guilty of such laches as should deprive him of all compensation for the use of his property. *Id.* at 369–70.

Similarly, the court concluded in *Durda* that a vendee of a land contract who remains in possession after receiving a notice of forfeiture and after allowing the applicable cure period to expire is required to pay rent for his continued possession of the subject property even if he is only a tenant by sufferance. *Durda v. Chembar Dev. Corp.*, 95 Mich.App., at 714–15, 291 N.W.2d 179. *See also, Ducey Lumber Co. v. Lane*, 58 Mich. 520, 25 N.W. 568 (1885) (purchaser of lumber which is left at seller's premises must pay rent after being given notice to remove the lumber or pay rent); *Dwight v. Cutler*, 3 Mich. 566 (1855) (prospective purchaser of real property who remains in possession after negotiations have ceased must pay rent if owner notifies him that continued possession will require payment of rent).[18]

---

17. Indeed, many "hold-over tenancies" today are neither tenancies by sufferance or tenancies at will. Most landlords and tenants who enter into written lease agreements negotiate the terms of a possible hold-over by the tenant as part of the original lease. Consequently, a hold-over under such circumstances would not create a new tenancy; rather, the hold-over would simply reflect the realization of a contingency already provided for under the existing lease.

18. Michigan courts have also recognized the right of an owner to recover from a trespasser the reasonable rental value of the subject

The second hypothetical I have posed assumes that the Clinton Township facility is empty when Debtor files its Chapter 7 petition but that the bankruptcy estate nonetheless remains in possession of the premises even after the unexpired lease agreement with Carini is deemed rejected. Under Michigan law, the bankruptcy estate's continued occupancy of the premises (*i.e.*, hold-over), would create a new tenancy, that being a tenancy by sufferance, between Carini and the bankruptcy estate. Under such a tenancy, Carini would have the right to demand that the bankruptcy estate quit the premises at any time and to evict the estate if it refused.[19] However, if Carini's intention was to allow the bankruptcy estate to remain in possession and to recover rent for that possession, then Carini would have to establish some new agreement with the bankruptcy estate so as to elevate the post-rejection tenancy by sufferance to a tenancy which would permit Carini's collection of the desired rent.

▇ Again, it is tempting to look to the prior lease between Carini and Debtor for the requisite agreement to create a post-rejection landlord/tenant relationship between Carini and the bankruptcy estate which would allow for the recovery of rent. Michigan law does indeed permit such a relationship to be implied from a tenant's hold-over after a lease has expired. *See, e.g., School Dist. No. 11 of Alpine Twp., supra.* However, a bankruptcy estate's post-rejection possession of leased premises is not based upon the continuation of an expired lease. Rejection of a lease under the Bankruptcy Code means that the bankruptcy estate is in breach of an unexpired lease. 11 U.S.C. § 365(g). By rejecting an unexpired lease, the bankruptcy trustee is not communicating to the landlord that the bankruptcy estate wishes to continue the landlord/tenant relationship which had existed pre-petition between the landlord and the debtor. To the contrary, the bankruptcy trustee is unequivocally communicating to the landlord that the bankruptcy estate no longer intends to perform the debtor's obligations under the existing lease agreement. Moreover, the bankruptcy trustee is communicating to the landlord that the bankruptcy estate will administer whatever claim the landlord might have as a result of the lease's rejection, including the landlord's claim for all future rents over the remaining term of the lease, as an unsecured, non-priority claim which may be paid pennies on the dollar, if anything at all. Consequently, it is absurd to even consider the bankruptcy estate's continued possession of leased premises subsequent to the estate's rejection of the underlying lease as being a sufficient basis to imply a new landlord/tenant relationship between the bankruptcy estate and the debtor's former landlord. More is required in order for the owner to re-establish its right to receive post-rejection rent from the bankruptcy estate.

To summarize, the bankruptcy estate's rejection of an unexpired lease constitutes

---

property as damages resulting from the trespass. *Pasieczny v. Bonkowski,* 260 Mich. 107, 244 N.W. 248 (1932). However, the allowance of such damages is nothing more than a variation of the rule expressed in *Hogsett* and related cases, for the right to recover such damages is available only to the extent the trespasser remains in possession after the owner has demanded that he vacate the premises.

**19.** Michigan law requires that at least one month's notice must be given if a party wishes to terminate a tenancy by sufferance. MCLA § 554.134(a). However, if demand has been made upon the tenant by sufferance to pay rent and the tenant has refused, then the tenancy may be terminated by giving the tenant a written notice to quit within 7 days. MCLA § 554.134(3).

a breach of that lease. Whatever claim the debtor's landlord may have under that lease to recover rents for periods after the lease is rejected is incorporated into the landlord's pre-petition claim for damages. If the bankruptcy estate continues in possession of the premises post-rejection, it does so as a tenant by sufferance. As a tenant by sufferance, the estate would have no inherent obligation to pay debtor's former landlord rent for its continued occupancy.

Courts have also looked to the Bankruptcy Code itself as the legal basis for allowing the landlord an administrative claim for post-rejection rent until the premises have been surrendered. For example, in *In re Longua*, the court inferred from Sections 365(d)(3) and 365(d)(4) a continuing obligation of the bankruptcy estate to pay the rent due under the rejected lease agreement until the bankruptcy estate actually surrendered the premises.

What is less clear is the amount of rent that Levy Brothers is entitled to receive for the period during which the trustee held over after the lease was rejected by the trustee's failure to assume the lease within the sixty-day period. *See* 11 U.S.C. § 365(d)(4). Under subsection (d)(3) the trustee is only required to perform the debtor's obligations under the lease until the lease is rejected. It could be argued that once the lease is rejected any claim for the holdover period would be subject to the normal standards for administrative expense contained in section 503(b). However, section 365(d)(4) states unambiguously that if the trustee does not assume or reject an unexpired lease within the sixty-day period "the trustee shall immediately surrender such nonresidential real property to the lessor." 11 U.S.C. § 365(d)(4). Here, the trustee failed to conform to the statutory requirement when he held over until January 21.

The intent of Congress, evidenced both by the statutory language and the legislative history, makes clear that section 365(d) was amended to protect lessors from the risk of loss in bankruptcy cases due to the trustee failing to make timely provision for unexpired leases. To require Levy Brothers to meet section 503(b) standards for the hold-over period would thus undermine the express purpose of Congress and would violate section 365(d)(4) of the Code. The Levy Brothers are entitled to the full recovery of its $9,750.00 claim as a priority administrative expense.

*In re Longua*, 58 B.R. at 506.

■ I disagree with the reasoning in *Longua*. I recognize that the Clinton Township facility is "non-residential real property" as that term is used in the Bankruptcy Code and that the bankruptcy estate was obligated to "immediately surrender such non-residential real property to the lessor" once the underlying lease agreement is deemed rejected. 11 U.S.C. § 365(d)(4). However, I also note, and the court in *Longua* concedes, that the duty imposed upon the bankruptcy estate by Section 365(d)(3) to pay rent as it comes due under the lease agreement continues only until the lease is rejected. Consequently, the *Longua* court's rationale for its decision is nothing more than an extrapolation of what it thinks Congress might do based upon the legislative history underlying Sections 365(d)(3) and 365(d)(4).

■ Moreover, the *Longua* court's prognostication is premised upon the conclusion that Section 365(d)(3) creates an administrative claim for unpaid rent which is independent of any administrative claim which may be allowed under Section 503(b)(1)(A). I disagree with this premise. As I explained in *In re Palace Quality*

*Services,* neither Section 363(d)(3) nor 363(d)(10) creates a separate claim for administrative rent. These sections simply establish statutory "triggers" which the landlord or lessor may employ to facilitate the recovery of leased property from the bankruptcy estate. *In re Palace Quality Services,* 283 B.R. at 873–78. If, as I have concluded, Section 363(d)(3) does not support an administrative claim for unpaid rent which accrued prior to the rejection of the underlying lease agreement, then neither that section nor the legislative history can support a conclusion that a landlord is entitled to an administrative claim for rent which accrued under the lease agreement subsequent to its rejection.

■ Other courts have inferred from Section 503(b)(1)(A) itself the authority for a landlord to recover post-rejection rent from the bankruptcy estate if it remains in possession of the premises. *See, e.g., In re Rare Coin Galleries of America, Inc.,* 72 B.R. 415, 417 (D.Mass.1987); *In re Western Monetary Consultants,* 100 B.R. 545, 547 (Bankr.D.Colo.1989); *In re International Ventures, Inc.,* 215 B.R. 726, 728 (Bankr.E.D.Ark.1997). I agree with these courts that Section 503(b)(1)(A) limits the recovery of post-rejection administrative rent to whatever rent is reasonably necessary to preserve the bankruptcy estate. However, I cannot find anything within this section, or, for that matter, within the Bankruptcy Code generally, which actually creates a right for the landlord to recover the requested rent from the bankruptcy estate. Section 503(b)(1)(A), in conjunction with Section 507, sets forth how a post-petition claim for rent is to be administered relative to other claims against the estate. However, neither of these sections addresses whether the claimant has the right to recover rent in the first place. These sections simply assume that the right exists. Consequently, if a landlord is

to have any right to continue collecting rent from the bankruptcy estate after the unexpired lease has been rejected, it must find that right from some source of law other than the Bankruptcy Code.

■ Of course, the debtor's former landlord and the bankruptcy estate could enter into a new lease for the bankruptcy estate's post-rejection use of the premises. As stated earlier, the bankruptcy estate is a legal entity which is capable of entering into its own lease agreements. There certainly are reasons why a bankruptcy estate might wish to continue leasing space from the debtor's former landlord even though it has rejected the unexpired lease upon which the estate's occupancy was originally premised. The most frequent reason is that the bankruptcy estate owns personalty located at the premises and that it is more convenient for the bankruptcy estate to continue storing these items at the current site than to relocate them to another site. Another reason might be that the debtor-in-possession had inadvertently allowed an unexpired lease of commercial property to be deemed rejected under Section 365(d)(4) and that it must now negotiate a new lease with the landlord in order to remain in possession of premises which are necessary for its reorganization. Indeed, a trustee or debtor-in-possession might intentionally reject an unexpired lease and then enter into new negotiations for the use of the same premises if it appeared that the debtor's former landlord had no alternative but to re-let the premises to the estate at a greatly reduced rate under a new agreement.

■ A claim for post-rejection rent may also arise if the conduct of both debtor's former landlord and the bankruptcy estate subsequent to the lease's rejection is sufficient to imply the creation of a new landlord/tenant relationship between the former landlord and the bankruptcy es-

tate. If such a relationship can be inferred, then the post-rejection tenancy by sufferance would transform into a tenancy at will and the owner would re-gain the right to recover rent for the bankruptcy estate's continued occupation of its property. Ordinarily, the mere continuation of possession by the bankruptcy estate subsequent to rejection of an unexpired lease is not enough to warrant such an implication. On the other hand, if the bankruptcy estate were to have a valuable interest in tangible personalty located on the premises, then the bankruptcy trustee's continued use of the premises for this purpose and the former landlord's acquiescence to the bankruptcy estate's continued use might support the inference that a new agreement between the bankruptcy estate and the owner has been reached.

 Indeed, in the instant case, Carini has offered two bases for implying that a new landlord/tenant relationship had been established between the bankruptcy estate and itself concerning the bankruptcy estate's continued possession of the Clinton Township facility subsequent to the bankruptcy estate's rejection of the Carini lease agreement. First, Carini argues that the furniture and equipment which remained at the site for the balance of the Chapter 11 proceeding and for approximately two months of the Chapter 7 proceeding had significant value. If true, then the bankruptcy estate's failure to remove this property could be construed as a manifestation of the bankruptcy estate's intention to continue leasing at least a portion of the space from Carini, especially if Carini could also show that the cost to the estate of moving the property to a different location was prohibitive. Second, Carini argues that one of Debtor's principals had indicated to it sometime after the commencement of Debtor's Chapter 11 proceeding that Debtor intended to assume the Carini lease agreement in order to resume operations at the Clinton Township facility or to assign its leasehold interest to a third party. If this claimed conversation took place after the Carini lease agreement was deemed rejected, then such comments could be interpreted as further proof that Debtor, as debtor-in-possession, intended to create a new landlord/tenant relationship between Carini and the bankruptcy estate notwithstanding the estate's prior rejection of the unexpired Carini lease.[20]

In addition, under Michigan law, even if an explicit or implicit agreement between the debtor's former landlord and the bankruptcy estate to create a new landlord/tenant relationship cannot be found, and therefore, the bankruptcy estate's post-rejection occupancy of the leased premises remains that of only a tenant by sufferance, the bankruptcy estate still could be compelled to pay rent if the estate continued in possession after the former landlord had demanded that it quit the premises. In the instant case, Carini alleges that it did threaten to repossess the Clinton Township facility sometime after the lease was deemed rejected and that its threat prompted a response from Debtor to con-

**20.** A bankruptcy estate's failure to timely surrender leased premises as required by Section 365(d)(4) might also be relevant in determining whether a new landlord/tenant relationship may be implied from the bankruptcy estate's post-rejection occupancy of the leased premises. For example, a former landlord's argument that the trustee's decision to continue storing valuable equipment at the leased premises until it could be sold as opposed to relocating it evidences a new landlord/tenant relationship would certainly be buttressed if the former landlord could also establish that the trustee or debtor-in-possession made the decision to continue in possession with full knowledge that Section 365(d)(4) imposed an affirmative duty to surrender possession immediately upon the deemed rejection of the original lease agreement.

tinue the landlord/tenant relationship. Consequently, a portion of Carini's post-rejection Chapter 11 administrative rent claim (*i.e.*, the interval from when the demand to quit was made until the date of conversion to Chapter 7) could be supported on this basis as well.

I am unable to determine from the record before me whether or not the bankruptcy estate and Carini reached a post-rejection agreement to create a new landlord/tenant relationship concerning the estate's continued possession of the Clinton Township facility. I am also unable to determine from the record whether such a relationship can be implied from the conduct of Debtor and Carini subsequent to the deemed rejection of the Carini lease agreement. Finally, I am unable to determine from the record whether Carini made a post-rejection demand upon the bankruptcy estate to quit the Clinton Township facility. Therefore, a new hearing will need to be scheduled in order to take proofs with respect to these evidentiary issues.

■■■■■ The record is also not sufficient to determine the amount of rent Carini should be awarded as a Chapter 11 administrative expense. Michigan law provides that reasonable compensation is to be paid by the tenant under circumstances where a right to recover has been found but where there is no agreement as to the actual amount to be paid. *Hogsett v. Ellis*, 17 Mich. 351, 367 (1868), *Dwight v. Cutler*, 3 Mich. 566, 572 (1855). Presumably, the rate which had been agreed upon by Carini and Debtor in the prepetition lease agreement would have some probative value in making this decision. However, it would not be dispositive. For example, proofs offered by the Chapter 7 trustee that the only purpose of the bankruptcy estate's continued possession of the premises was to store the remaining equipment and furniture located at that site pending liquidation and that Carini had no other prospective tenant for the space during this interval would support an award based upon a rental rate more in line with that of a warehouse than an award based upon what Debtor had agreed to pay Carini pre-petition for a facility to treat patients.

■■■■ However, what Michigan law might permit as a reasonable rate of rent addresses only one aspect of Carini's claim against the estate. Reference to the law of Michigan is certainly necessary to ascertain what, if anything, Carini is entitled to recover as rent from the bankruptcy estate in its capacity as a post-rejection occupant of the premises. However, Carini's request is more than just a request that its claim against the estate for post-rejection rent be recognized as enforceable under the law. Carini also requests that its claim be afforded administrative priority in conjunction with the Chapter 7 trustee's administration of the bankruptcy estate. 11 U.S.C. § 507(a)(1). Priority of distribution in a bankruptcy proceeding is a question of federal law, not state law. Consequently, what Carini is entitled to as an administrative rent claim is ultimately to be decided by the Bankruptcy Code itself.

Administrative expenses are limited to only those expenses delineated by Section 503(b). Specifically, claims against the bankruptcy estate for administrative rent must fit within the definition of Section 503(b)(1)(A).

> After notice and a hearing, there shall be allowed administrative expenses ... including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commis-

sions for services rendered after the commencement of the case:

28 U.S.C. § 503(b)(1)(A).

Consequently, what a claimant may be able to recover as an administrative expense may not be the same as what the claimant would otherwise be entitled to receive under non-bankruptcy law. All that will be allowed as an administrative expense is that portion of a claim which was in fact necessary to preserve the estate.

Carini asserts that its post-rejection administrative claim should be based upon the $8,125.00 per month rate provided for in the original lease agreement between Carini and Debtor. Carini concedes that the rate it is actually entitled to is the fair rental value of the Clinton Township facility during the post-rejection interval the bankruptcy estate remained in possession of the facilities. However, Carini argues that it is entitled to the presumption that the $8,125.00 rate reflected the facility's fair rental value and that the Chapter 7 trustee did not rebut this presumption. *See, e.g., In re Trak Auto Corp.*, 277 B.R. at 666–67.

At a minimum, the Chapter 7 trustee should be given a second chance to challenge the $8,125.00 rate at the future evidentiary hearing which must be held. However, I conclude that such an effort is not necessary. In order to prevail on its theory, Carini must establish that $8,125.00 per month was in fact the price which the Chapter 7 trustee has to pay as administrative rent for the Clinton Township facility in order to preserve the estate. Carini's argument might have had some merit had Carini made its claim for administrative rent on a prospective basis sometime during the Chapter 11 proceeding. If Carini is to be believed, one or more of Debtor's principals did meet with it during this interval for the express purpose of preserving the Clinton Township facility as part of Debtor's reorganization plans. Had Carini pressed its claim for administrative rent at that time, the court would have had no alternative other than to decide whether Debtor's prospects for reopening the Clinton Township facility were of sufficient value to the bankruptcy estate to warrant paying the $8,125.00 per month demanded by Carini.

However, Carini did not make its request for administrative rent until January 18, 2001. Consequently, the court has the benefit of hindsight to assess Carini's argument. While Debtor may have hoped to reopen the Clinton Township facility, it never did. Nor did the Chapter 7 trustee. Indeed, Concentra declined the opportunity to resume operations at that site when it purchased the bankruptcy estate's assets at the other two sites which had remained open. Consequently, it appears that the only post-rejection value the Clinton Township facility had to the bankruptcy estate was as a storage site for Debtor's equipment and furniture that remained at that location. Therefore, the amount of Carini's post-rejection administrative rent claim should be measured based upon the cost associated with preserving the remaining equipment and furniture. Put differently, the rental rate which should be used to calculate Carini's post-rejection Chapter 11 administrative claim is the rate which the estate would have had to pay to store the equipment and furniture elsewhere with some adjustment to reflect the savings realized by the bankruptcy estate of not having to move the equipment and furniture elsewhere.

Limiting Carini's post-rejection administrative claim to this amount at first may seem unfair. After all, the bankruptcy estate did remain in possession of the Clinton Township facility beyond whatever right it had for possession under the origi-

nal Carini lease agreement. However, it was Carini, not the bankruptcy estate, which ultimately controlled whether that possession could continue. While Carini may have been constrained by Sections 362 and 365 from recovering from the estate possession of the Clinton Township facility so long as the original Carini lease agreement remained unrejected, that constraint disappeared when the lease was rejected on August 27, 1999. From that date on, Carini had the unrestricted right to modify the automatic stay in order to commence eviction proceedings in state court. *In re Palace Quality Services*, 283 B.R. at 878. Indeed, Carini could have procured an order from the bankruptcy court itself directing the bankruptcy estate to immediately surrender the Clinton Township facility to it. 11 U.S.C. § 364(d)(4).

Carini also had the option of entering into a new post-rejection landlord/tenant relationship with the bankruptcy estate. However, if Carini elected this option, it was also incumbent upon Carini to have the arrangement approved by the bankruptcy court as necessary for the preservation of the estate. 11 U.S.C. § 503(b)(1)(A). Carini had the opportunity to secure the requisite approval at the outset of whatever arrangement it believes it had with the bankruptcy estate for its continued post-rejection use of the Clinton Township facility. Carini instead chose to wait. Consequently, Carini also assumed the risk that hindsight would prove that what was necessary as administrative rent with respect to the bankruptcy estate's continued use of the Clinton Township facility was actually less than what Carini has claimed.[21]

**21.** I see nothing within Section 503(b)(1)(A) which prevents a landlord or, for that matter, any administrative claimant, from seeking allowance of a claim against the bankruptcy estate after the fact. Indeed, it would be impossible for tort-type claims which arose in conjunction with the trustee's administration of the estate to be "pre-approved" and Section 503(b)(1)(A) makes no distinction between contract claims and tort claims for purposes of allowance as an administrative expense. However, allowing as an administrative expense only a portion of what had previously been agreed upon between the claimant and the estate raises questions concerning the disposition of the balance which has been disallowed. For example, suppose Carini and the Chapter 11 debtor had without court approval agreed that the bankruptcy estate would continue in possession of the Clinton Township facility after rejection of the lease at the same rate of rent and that the bankruptcy court later determines that the agreed rate was not necessary for the preservation of the estate (*e.g.*, the only purpose for staying in possession was to store the remaining furniture and equipment at an alternate site for a much cheaper rate). Does Carini have any right to recover the difference between what it had agreed upon with the

Chapter 11 estate and what it is ultimately allowed to recover as an administrative expense?

One approach would be to deny Carini's residual claim altogether on the theory that the authority of Debtor, as debtor-in-possession, to bind the estate is limited to only what the court will permit pursuant to Section 503(b)(1)(A). If approval of an agreed upon expense were sought after the fact and the court refused to allow the entire amount as an administrative expense, then the remaining balance would simply disappear.

Another approach would be to recognize Debtor's authority to bind the estate to the terms of the agreement without prior court approval and to then administer whatever residual was not allowed as an administrative claim as a separate claim against the estate. If Debtor had successfully reorganized, then Carini would have had to look to the confirmed plan to determine the treatment of this residual claim. However, since the case in fact converted to a Chapter 7 proceeding, Carini's residual claim would have been treated as if it were a pre-petition claim. 11 U.S.C. § 348(d).

I am inclined to conclude that the latter approach is more consistent with the framework of the Bankruptcy Code. However, it is

To summarize, a landlord has no inherent right to recover rent from the bankruptcy estate if the bankruptcy estate remains in possession of the premises subsequent to its post-petition rejection of the underlying lease agreement with that landlord. The landlord could negotiate a new lease with the bankruptcy estate under which the estate itself would agree to pay rent for its continued possession of the premises. However, absent such an express agreement, the landlord would have to establish that the bankruptcy estate and it had reached an implicit agreement to establish a new landlord/tenant relationship (presumably, a tenancy at will) for the estate's post-rejection possession of the premises. At a minimum, the landlord would have to establish that it had requested the bankruptcy estate to vacate the premises subsequent to its rejection of the unexpired lease and that the bankruptcy estate had ignored its demand.

However, even if the landlord is able to establish a basis under applicable state law to recover rent from the bankruptcy estate for its post-rejection occupancy of the premises, the amount which the landlord would be allowed to recover as an administrative expense would not necessarily be the amount which the landlord and the bankruptcy estate had agreed upon or the amount which would be considered reasonable under Michigan law if no agreement

concerning rent had been reached between the parties. The amount which would ultimately be allowed as an administrative claim for the estate's occupancy of the premises during the post-rejection interval would only be that portion which was determined by the bankruptcy court to be actually necessary to preserve the estate after notice and an opportunity to be heard was given to appropriate parties.[22]

Therefore, an evidentiary hearing must be held in conjunction with Carini's claim for post-rejection Chapter 11 administrative rents to determine (1) whether there was an express post-rejection agreement between Carini and the bankruptcy estate for the estate to continue paying rent to Carini; (2) whether an agreement between Carini and the bankruptcy estate to create a new post-rejection landlord/tenant relationship can be implied if no express post-rejection agreement can be found; (3) whether Carini at any time after the deemed rejection of the Carini lease agreement demanded the bankruptcy estate to quit the premises and the estate failed to comply; (4) what would be a reasonable rent for the bankruptcy estate's post-rejection occupancy of the premises if an agreement can be implied or a post-rejection demand to quit was made; and (5) whether all or only a portion of the rent which must be paid by the estate for its post-rejection occupancy should be allowed as an admin-

---

not a decision that I must make since the only issue before me is the allowance of Carini's claims for rent as administrative expenses.

**22.** At first blush, it would appear that a landlord who is awarded administrative rent for the bankruptcy estate's post-rejection occupancy of the leased premises is receiving a double recovery. After all, the landlord is already being compensated for this interval by the inclusion of rents due under the original lease agreement for this same interval as part of its Section 502(g) rejection claim. However, this apparent inconsistency is reconciled

through the credit of any such post-rejection administrative rents against the landlord's pre-petition rejection claim. If the landlord had re-let the premises to a third party immediately after the bankruptcy estate's rejection of the unexpired lease agreement, there is no question that all of the rents received by the landlord from the new tenant would have to be credited against the landlord's Section 502(g) claim for damages. There is no reason why administrative rents received from the bankruptcy estate itself for its post-rejection occupancy of the premises should not be treated in the same manner.

istrative expense. An evidentiary hearing will also be necessary to consider the defenses raised by the Chapter 7 trustee as a bar to whatever Carini might otherwise be entitled to as rent for this period (*e.g.*, the Chapter 7 trustee's assertion that Carini should be barred from recovering any rent for this time period because it had allegedly conspired with the Debtor's owners).

### 3. *Carini's Chapter 7 Administrative Rent Claim.*

Carini's Chapter 7 administrative rent claim is for the two months the bankruptcy estate allegedly remained in possession of the Clinton Township facility after Debtor's case converted to a Chapter 7 proceeding on March 16, 2000. Carini has not alleged any post-conversion conversation with the Chapter 7 trustee to support either a new lease agreement with the Chapter 7 trustee or to support an argument that demand had been made upon the Chapter 7 trustee to quit. There is also no suggestion from the record that the parties' conduct during this interval could be interpreted as an implied agreement to create a new landlord/tenant relationship. Consequently, it does not appear that either party will have to present proofs regarding Carini's right under non-bankruptcy law to recover rent for this period beyond the proofs already presented concerning the same issue with respect to Carini's post-rejection Chapter 11 administrative claim. If Carini has a right under non-bankruptcy law to recover rent from the bankruptcy estate for the two months following the conversion to a Chapter 7 proceeding, that right will have to derive from whatever right Carini is able to establish for the post-rejection Chapter 11 period.[23]

A separate legal issue will arise if Carini's right to recover rent during the Chapter 7 proceeding is based upon a demand to quit made by Carini during the Chapter 11 proceeding. The question will be whether such a demand was sufficient to carry over to the Chapter 7 proceeding or whether a second demand had to be made upon the Chapter 7 trustee.

If Carini is able to establish a Chapter 7 administrative rent claim for the two-month interval following Debtor's conversion to a Chapter 7 proceeding, the Chapter 7 trustee will have the opportunity to proceed with the various defenses he has raised to bar Carini's claims altogether (*e.g.*, Carini should be barred from recovering any rent for this period because it allegedly conspired with Debtor's owners). Presumably, the parties will rely upon the same proofs introduced in connection with the Chapter 7 trustee's assertion of the same defenses to any Chapter 11 administrative claim which the court might otherwise allow.

### 4. *Carini's Claim for Attorneys' Fees.*

The record is also insufficient to determine whether all or a portion of Carini's

---

**23.** In reaching this conclusion, I have taken into consideration Section 348(c). That section provides:

> Sections 342 and 365(d) of this title apply in a case that has been converted under section 706, 1112, 1208, or 1307 of this title, as if the conversion order were the order for relief.

11 U.S.C. § 348(c). If this case had been converted to a Chapter 7 proceeding prior to the expiration of the time within which Debtor, as debtor-in-possession, had to assume or reject the Carini lease agreement pursuant to Section 365(d)(4), then Section 348(c) would have permitted at least another 60 days to assume or reject the lease. However, the Carini lease agreement was deemed rejected on August 27, 1999, well before the March 16, 2000 conversion date. Consequently, Section 348(c) is irrelevant in the instant case. The decision to reject the Carini lease agreement had already been made and the Bankruptcy Code does not contemplate the bankruptcy estate's assumption of an executory contract or unexpired lease once it has been rejected by the estate. *Cf.* 11 U.S.C. § 365(g)(2).

$13,539.00 claim for attorneys fees may be allowed as an administrative claim. Carini bases its claim upon the terms of the pre-petition lease agreement between Debtor and Carini.

> Legal Expenses. If suit shall be brought for recovery of possession of the demised Premises, for the recovery of rent or any other amount due under the provision of this Lease, or because of the breach of any other covenant herein contained on the part of the Tenant to be kept or performed, and a breach shall be established, Tenant shall pay to Landlord all expenses incurred therefore, including attorney fees and/or any commissions to be paid by Landlord for the reletting of the Premises.

Paragraph 48.b. Carini lease agreement.

■ To the extent Carini actually incurred attorney fees in enforcing its rights under the terms of that lease, then Carini would have a cognizable post-petition claim for the same. However, only the portion of that amount which was incurred before the August 27, 1999 rejection of the Carini lease agreement would be allowable as a Chapter 11 administrative claim. Any such fees incurred after the rejection of the Carini lease agreement would "relate back" as part of Carini's damage claim against Debtor and be treated as a pre-petition non-priority claim. 11 U.S.C. § 502(g).

■ Moreover, it appears that most of Carini's legal efforts were directed at recovering administrative rent from the bankruptcy estate for its post-rejection occupancy of the Clinton Township facility. As already discussed, Carini may not rely upon the terms of the rejected lease agreement with Debtor to support its claim for administrative rent for this interval. Carini must instead establish its right to receive post-rejection administrative rent upon either a separate landlord/tenant re-lationship between Carini and the bankruptcy estate or a post-rejection demand by Carini to quit. Similarly, Carini may not rely upon the provision in a rejected lease agreement with Debtor to support its claim for attorneys fees associated with the recovery of any post-rejection administrative rent. Whatever right Carini may have to recover such fees must derive from the same post-rejection landlord/tenant relationship or demand to quit that Carini must rely upon to support its overall claim for post-rejection administrative rent. While I am dubious that any such right can be found, Carini will have the opportunity to make this argument as part of the evidentiary hearing to be held. Carini will also have the opportunity to offer proofs concerning any attorneys fees it may have incurred during the two month interval before the Carini lease agreement was deemed rejected on August 27, 1999. If Carini can establish that it incurred attorney fees during this time period, then this amount may be added to Carini's pre-rejection Chapter 11 pre-rejection administrative rent claim.

## III. CONCLUSION

For the reasons stated in this opinion, Carini's motion to reconsider is granted. A separate order consistent with this opinion will be entered. The court will schedule an evidentiary hearing for the presentation of proofs concerning the matters I have identified in this opinion.